826 P.2d 919

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Maria REYES, Defendant–Appellant.**

**No. 19073.**

Court of Appeals of Idaho.

Feb. 20, 1992.

Van G. Bishop, Nampa, for defendant-appellant.

Larry J. EchoHawk, Atty. Gen., Jack B. Haycock, Deputy Atty. Gen., Boise, for plaintiff-respondent.

SILAK, Judge.

About mid-day on April 17, 1990, Maria Reyes went to the play pen where she had put her nine-week-old son, Phabian, to bed. When she tried to wake the infant, Reyes discovered he was dead. The initial diagnosis of the coroner indicated the cause of death was Sudden Infant Death Syndrome (SIDS), however, subsequent tests of the infant's body fluids revealed that the infant's death was caused by cocaine overdose. Reyes was indicted on one count of felony injury to a child, I.C. § 18–1501(1). She was convicted after a jury trial.

The district court entered a judgment of conviction and imposed a unified sentence of six years in the custody of the Board of Correction, with a three-year minimum term of confinement. Reyes appeals the judgment of conviction and the sentence imposed by the district court, arguing: (1) that there was insufficient evidence to support the jury's verdict; and (2) that the trial court abused its discretion by imposing an unreasonably harsh sentence. For the reasons stated below, we affirm the judgment of conviction and the sentence imposed by the district court.

## FACTS

Phabian Reyes was born on February 8, 1990, to Maria Reyes. The nurses attending Phabian after delivery noticed that he exhibited classic symptoms of cocaine addiction; i.e., a shrill, high pitched, and loud cry; jitteriness; nervousness; irritability; inability to ingest and retain food properly; unresponsiveness to calming and comforting measures; and hypersensitivity to external stimuli causing the infant to startle very easily. Tests performed that same day revealed the presence of cocaine in Phabian's system. Phabian remained in the hospital for six days while his body completed the process of cocaine withdrawal, after which time he was released to Reyes.

Reyes, 23, lived in a home with Phabian and her four other children ages 9, 8, 6, and 5; her sister Rosa, 16; and Rosa's infant daughter. Phabian slept in the same room as Reyes. Around mid-day, on April 17, 1990, when he was nine weeks old, Reyes went to wake Phabian and found that he was dead. Fire officials, paramedics, and police officers were called and responded to the scene at approximately 1 p.m., where they found that, based on the body's symptoms of rigor mortis and lividity, Phabian had been dead for several hours.

The following day, April 18, samples of the infant's body fluids were taken and

sent for testing and analysis. After a postmortem examination was performed on April 19, the pathologist initially concluded that Phabian had died from SIDS. Subsequently, however, the test results of the infant's body fluids conclusively revealed that Phabian's death was the result of a massive cocaine overdose.

Following police investigation of the incident, a grand jury indicted Reyes for felony injury to a child, I.C. § 18–1501(1). Reyes pled not guilty and requested a jury trial. In presenting its case at trial, the state relied entirely on circumstantial evidence to raise the inference that Reyes had inflicted the fatal injuries to Phabian. On appeal, Reyes asserts that the evidence presented at trial was insufficient to support the verdict of guilty. She also asserts that the sentence imposed by the district court was excessive, and should be reduced.

## I.

■ We first address Reyes's assertion that the evidence was insufficient to sustain the jury's verdict. The applicable standard of review is whether there was substantial evidence upon which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980); *State v. Ojeda*, 119 Idaho 862, 864, 810 P.2d 1148, 1150 (Ct.App.1991). The jury is accorded the right to determine the credibility of witnesses, to weigh the evidence, and to draw all reasonable and justifiable inferences. *Ojeda*, 119 Idaho at 864, 810 P.2d at 1150; *State v. Fenley*, 103 Idaho 199, 203–204, 646 P.2d 441, 445–46 (Ct.App. 1982). On appeal, the evidence is reviewed in the light most favorable to the state. *Id.*

The crime of felony injury to a child is defined as follows:

Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one (1) year, or in the state prison for not less than one (1) year nor more than ten (10) years.

I.C. § 18–1501(1).

■ When questioned by authorities about the fact that Phabian had been born addicted to cocaine, Reyes stated that the baby might have been exposed to cocaine on a single occasion approximately one week before he was born, when, at a party, Reyes had been drinking and was given "something" by somebody which could have been cocaine. A friend of Reyes testified, however, that Reyes was a "cocaine user." Experts also testified that Phabian would not have manifested the symptoms of cocaine addiction that he presented after birth unless he had experienced multiple episodes of exposure to cocaine. One expert stated that a newborn exhibiting symptoms of addiction such as Phabian displayed would likely have experienced prenatal exposure to the drug on a regular, or chronic, basis. Expert testimony further indicated that Phabian would not have tested positive for cocaine in his system unless Reyes had used cocaine within the twelve to twenty-four hours immediately preceding birth. From this evidence, and the justifiable inferences the jury could draw from it—that Reyes regularly used cocaine, that she had used cocaine twice during her last week of pregnancy, and that her baby was born addicted to cocaine—the jury could have reasonably concluded that Reyes was a user of cocaine, and that she had ready access to the drug.

The state's evidence also showed that on the morning of April 17, 1990, between 2:30 and 3:00 a.m., both Reyes and her sister, Rosa, arose to feed their babies. They prepared their babies' bottles from the same can of powdered formula, and then fed their babies separately, in their own rooms. Reyes stated that at about 3:30 a.m. she finished feeding Phabian, burped him, and returned him to his bed. Reyes,

who slept in the same room with Phabian, did not attempt to wake him until about 12:30 p.m. that day. Thus, the nine-week-old infant was in bed in the same room with Reyes for about nine hours without Reyes attempting to wake, feed, or change the infant. A paramedic and the chief deputy coroner both testified that, based on the body's symptoms of rigor mortis and lividity, by 1 p.m. the infant had been dead for at least several hours.

The infant's blood test results showed that he had ingested "almost a gigantic amount of cocaine." In the words of one of the experts:

> [T]his kid received a lump—a very large amount of cocaine[, which] produced a blood level that is extraordinarily high, in our experience, and we in our laboratory will see, oh, five to fifteen urine—positive urine blood cocaine tests each week. This is one of the highest that we have seen for a long, long period of time in adults; and in a child it's the highest that we have had in the years that I have been there.

The expert testimony also revealed that it would have been impossible for someone to inject the drug into the infant after he was already dead. The same expert testified, "This infant was alive when he was given the cocaine, and this live child was then poisoned and died as a result of this material." According to the statements which both Reyes and her sister made to investigators, they were the only adults in the house during the relevant time period, and it would have been impossible for anyone else to enter the house without their knowledge.

We conclude that the evidence adduced at trial, and the inferences that could justifiably be drawn from that evidence, support the jury's conclusion that Reyes was criminally liable for willfully causing or permitting the infusion of cocaine into Phabian and thus, was guilty of felony injury to a child.

Reyes asserts, however, that her conviction cannot be sustained because the state produced no direct evidence that she willfully caused or permitted her infant to suffer injury or be placed in a situation where his person or health was endangered. To support this contention, Reyes cites *Ojeda* for the rule that a conviction cannot be based upon circumstantial evidence where such evidence is capable of explanation by a reasonable hypothesis consistent with innocence. While this rule is correctly stated, its application does not assist Reyes in this case. The state's evidence showed that Reyes and her sister were the only adults in the house the night of the incident; that Reyes regularly had access to and used cocaine; that the child was born addicted to cocaine; that someone administered a lethal dosage of cocaine to the child; that Reyes was with the child throughout the night during which the child was given the drug; that Reyes fed Phabian a bottle of formula during the early morning hours preceding his death; and that Reyes did not attempt to feed Phabian, wake him, or pick him up between 3:30 a.m. and approximately 12:30 p.m., a span of nine hours. The jury was entitled to draw reasonable, justifiable inferences from the evidence. *Ojeda*, 119 Idaho at 865, 810 P.2d at 1151, and "[a] mere possibility of innocence will not invalidate a verdict of guilty on appeal." *State v. Price*, 93 Idaho 615, 617, 469 P.2d 544, 546 (1970), *cert. denied*, 400 U.S. 959, 91 S.Ct. 359, 27 L.Ed.2d 268 (1970); *Ojeda*, 119 Idaho at 865, 810 P.2d at 1151.

In *Ojeda*, the defendant presented to the jury an explanation, consistent with his innocence, of how the infant sustained the fatal injuries, although the jury found, as it was entitled to based on the state's evidence, that Ojeda's version of the fatal incident was not credible. In this case, Reyes has offered no evidence to rebut the state's case, and has never attempted to give an explanation of the infant's death which is based on a reasonable hypothesis and consistent with her innocence.

Upon these facts and the justifiable inferences the jury could draw from them, we hold that there was substantial evidence to support the jury's verdict.

## II.

Reyes also asserts that her unified sentence—three years fixed followed by an indeterminate period of three years—was excessive, and thus an abuse of the trial court's discretion. Because this sentence was within the ten-year maximum period of confinement allowed by statute, we will not disturb it absent a showing that the trial court abused its discretion. I.C. § 18–1501(1); *State v. Hedger*, 115 Idaho 598, 768 P.2d 1331 (1989).

A sentence constitutes an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). A sentence will be deemed reasonable if it appears at the time of sentencing that confinement is necessary "to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case." *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). Under *Toohill*, a sentence longer than necessary to achieve these goals constitutes an abuse of discretion. *Id.* In determining whether a sentence is longer than necessary to achieve these goals, and thus unreasonable, we consider the actual term of confinement imposed in light of the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Shideler*, 103 Idaho 593, 594, 651 P.2d 527, 528 (1982); *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). When, as in this case, a sentence is imposed under the Unified Sentencing Act, we treat the minimum period specified by the sentencing judge as the probable duration of confinement. I.C. § 19–2513; *State v. Sanchez*, 115 Idaho 776, 769 P.2d 1148 (Ct. App.1989). Thus, in reviewing Reyes's sentence, we will treat her actual term of confinement as three years.

We note initially, as we did in *Ojeda*, that [A]lthough a sentencing court is required to consider the substantive criteria set forth in *Toohill*, there exists no corollary requirement that it make specific factual findings in support of the sentence imposed. Thus, in order to prevail on appeal, [Reyes] must establish that, in light of the governing criteria, [her] sentence of [three] years' minimum confinement was excessive under *any reasonable view of the facts*.

*Ojeda*, 119 Idaho at 866, 810 P.2d at 1152 (citations omitted). Thus, in order to prevail, Reyes must show that her sentence is unreasonable based on the facts of the case, not based on the reasons, or lack of reasons, stated by the sentencing judge.

The following facts are relevant in evaluating Reyes's character and the nature of her offense. Reyes, a mother of four children and late into her third trimester of pregnancy, habitually used cocaine. Because of Reyes's cocaine use, her son was born addicted to the drug. This forced Phabian to endure the painful effects of cocaine withdrawal during his first days of life. Even after the initial effects of withdrawal were completed, the infant would have continued to experience the effects of drug addiction, and likely other long-term effects commonly found in "cocaine babies," related to damage to the brain and the entire central nervous system.

Reyes admitted to the sentencing judge that on the morning of the infant's death, at approximately 10 a.m., she stated to her sister, Rosa, that the infant had not yet awakened because "he's probably dead." Reyes attempted to explain this statement to the judge by stating that she had lost a little sister to SIDS, and made the statement to Rosa in fear that the same might have occurred with her son. That Reyes was fearful at 10 a.m. that her son had possibly died from SIDS, seems utterly inconsistent with other evidence, including Reyes's own statements, that she did not attempt to wake the infant until sometime between noon and 1 p.m.

The presentence investigator concluded that Reyes was:

[U]ntruthful, obnoxious, and belligerent. She seemed extremely bored with the whole situation. She would not acknowledge the findings of the lab reports that her child died from an overdose of cocaine. She insisted that he died of Sud-

den Infant Death Syndrome. She insisted that Deputy Coroner Vickie DeGeus got the blood and urine that was tested in the Metro Lab in Portland from a source other than her infant, Phabian.

When asked by the investigator why, on that particular day, she failed to feed the baby or to pick him up for approximately a ten-hour span of time, Reyes "belligerently answered, 'Well, I just didn't.'" Reyes's statements regarding her use of cocaine and the events that transpired surrounding the death of her son vary significantly among the various reports of the investigating officers.

At the time of sentencing, the trial judge stated that he found it extremely hard to believe that Reyes had no knowledge of how the cocaine got into the infant's body. In light of the evidence in the record, the trial judge's incredulity was justified. In view of the very serious nature of Reyes's offense, her chemical dependency, and her attitude of denial and belligerence, we hold that a three-year sentence of confinement is not unreasonable.

Our reasoning in *Ojeda*, a factually similar case, is equally applicable to the case before us:

We recognize the public interest lies not only in being safe from future crimes, but to some extent in seeing that punishment is imposed for crimes committed. This interest is particularly strong in crimes involving tragic or senseless acts. We believe that the public interest in punishing a serious offense, one involving unprovoked [injury] upon a human being causing his death, amply justifies the [three]-year minimum sentence of confinement imposed in this case. Additionally, the term of confinement ordered furthers the substantive goal of deterrence—specific deterrence. The record reveals that ... at the time of sentencing [Reyes expressed the desire to have two more children]. The sentence thus may be viewed as reflecting society's interest in protecting other infants from the type of dangerous acts which the jury found [Reyes] to have committed upon [Phabian].

*Ojeda*, 119 Idaho at 866, 810 P.2d at 1152 (citations omitted). Based on our review of the facts before the trial court at the time of sentencing, we are satisfied that the substantive criteria set forth in *Toohill* have been met and that the trial court did not abuse its sentencing discretion.

### CONCLUSION

Based on the facts and reasoning discussed above, we conclude there was sufficient evidence to support the jury's verdict of guilty. We also conclude that the trial judge did not abuse his sentencing discretion. Therefore, the judgment of conviction and the sentence imposed are affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.