949 P.2d 1077

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Oscar Rene JACO, Defendant–Appellant.**

No. 23125.

Court of Appeals of Idaho.

Dec. 12, 1997.

Lloyd J. Walker, Twin Falls, for defendant-appellant.

Alan G. Lance, Attorney General, Brian D. Nicholas, Deputy Attorney General (argued), Boise, for plaintiff-respondent.

SCHWARTZMAN, Judge.

A jury found Oscar Rene Jaco guilty of second degree murder, I.C. §§ 18–4001 to – 4003, enhanced for the use of a deadly weapon, I.C. § 19–2520. Jaco was sentenced to a unified thirty-year term, with twenty years fixed. On appeal, he alleges a number of errors by the district court. For the reasons explained below, we affirm.

## I.

### FACTS AND PROCEDURE

During the early evening hours of October 20, 1995, Gustavo Quezada was shot and killed in front of Bienvenido Flores's residence in the El Milagro Labor Camp in Twin Falls. On October 21, 1995, Oscar Rene Jaco was charged by criminal complaint with first degree murder for the death of Quezada, enhanced for the use of a deadly weapon.[1]

The events leading to Quezada's death and Jaco's arrest are as follows. Bienvenido Flores, his brother Jose Luis Flores, and a number of Bienvenido's friends assembled at Bienvenido's home throughout the day and evening of October 20, 1995, for an informal gathering. In the early evening, Jesus Reyes Jimenez walked into Bienvenido's home and called Bienvenido a "son of a bitch." In response, Bienvenido and his brother attacked Jimenez and removed him from Bienvenido's home.

Immediately following his confrontation with the Flores brothers, Jimenez fled to the nearby home of Martha Salcido, where both Salcido and Oscar Rene Jaco were present. Jimenez informed Salcido and Jaco that he had been attacked by some men at Bienvenido's home and asked Jaco to return with him to the residence. The sequence of events that followed is disputed. Both the prosecution's and Jaco's accounts were supported at trial by conflicting eyewitness testimony.

The prosecution attempted to prove that Jaco returned with Jimenez to the Bienvenido residence brandishing a weapon. Jaco fired a warning shot and ordered everyone out of Bienvenido's home. Following the evacuation, Jose Luis Flores attempted unsuccessfully to disarm Jaco and in response, Jaco stepped back, pointed the gun at Jose Luis and pulled the trigger. No bullet discharged. Thereafter, Quezada walked up and moved Jose Luis with his arm, urging

him to calm down and to leave the scene of the confrontation. Jaco then shot and killed Quezada.

The defense, on the other hand, presented evidence that when Jaco returned with Jimenez to the Bienvenido residence, a number of men exited Bienvenido's home and approached Jaco and Jimenez in a hurried and aggressive manner. In response, Jaco fired a warning shot. While Jaco was holding the gun, one or more individuals attacked him either from the side or from behind, causing him to stagger backward. While Jaco was attempting to regain his footing, the gun accidentally fired in an upward direction; the bullet struck and killed Quezada.

It is undisputed that following Quezada's death, Jaco fled with Martha Salcido, Jimenez and his wife to Jackpot, Nevada, pursued by Immigration officers and Twin Falls police officers. Jaco and his companions were found and Jaco was taken into custody at the Elko County Sheriff's Department in Jackpot. Officer Felix Garcia was one of the officers dispatched to interview Jaco. Garcia met with Jaco and read him his *Miranda* warnings. Thereafter, Jaco gave Officer Garcia a statement about the events leading to the shooting.

Jaco was charged with first degree murder. He pled not guilty and, following a jury trial, was found guilty of second degree murder, enhanced for the use of a firearm. Jaco was sentenced to serve an aggregate thirty-year prison term, with twenty years fixed.[2]

## II.

### ANALYSIS

#### A. *Miranda* Warnings

■ Jaco contends that because he was not properly Mirandized prior to being interrogated by Officer Garcia, the district court erred in denying his motion to suppress the

---

1. Jaco was also charged with attempted first degree murder. This charge was subsequently dismissed on May 15, 1996.

2. The district court imposed a unified twenty-five year sentence, with fifteen years fixed, for the second degree murder charge. With respect to the sentence enhancement for the use of a deadly

weapon, the court imposed a five-year fixed sentence. The sentences were ordered to run consecutively. The district court specified that the aggregate sentence, as a whole, not exceed thirty years. Because neither party challenges the legality of fashioning the sentence in this manner, we do not address it on appeal.

statement he gave to Garcia. In support of his claim, Jaco cites to *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), for the proposition that a person in custody must be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Jaco further contends that courts have consistently held that *Miranda* warnings must be understood by the recipient.

When this Court reviews an order denying a motion to suppress, we will not disturb the lower court's determinations of fact which are based upon substantial evidence. However, we exercise "free review of the lower court's decision as to whether the constitutional requirements have been satisfied in light of the facts found." *State v. Carey,* 122 Idaho 382, 384, 834 P.2d 899, 901 (Ct.App.1992). The state bears the burden of demonstrating by a preponderance of the evidence that a defendant has knowingly, intelligently and voluntarily waived his right to counsel. *State v. Brennan,* 123 Idaho 553, 556, 850 P.2d 202, 205 (Ct.App.1993). Whether a waiver constitutes a voluntary, knowing, and intelligent relinquishment of a right or privilege depends upon the facts and circumstances of the case, including the accused's background, experience, and conduct. *Id.*

Jaco filed a pre-trial motion to suppress statements he made to Officer Garcia. After holding an evidentiary hearing, the trial court denied Jaco's motion to suppress, concluding that Jaco received adequate *Miranda* warnings and that he voluntarily, intelligently, and knowingly waived his right to counsel. The interview between Garcia and Jaco was conducted in Spanish. Although Officer Garcia did "paraphrase" the *Miranda* warnings rather than reading them verbatim from a Spanish-language *Miranda* form, Jaco was informed that: (1) he had the right to remain silent; (2) anything he said could be used against him in court; (3) he had the right to speak with an attorney about the subject of the officers' questioning; and (4) the court would appoint an attorney if he could not afford one. Following this recitation of rights, Officer Garcia asked Jaco if he wanted to speak to him about the shooting. An English translation of the interview presented to the trial court indicates that the following exchange occurred:

FG [Garcia]: In accord with these rights, do you want to talk to us, what [sic] happened tonight?

OJ [Jaco]: Why not.

FG: OK. Do you want an attorney, yes or no?

OJ: I can't pay one.

FG: OK. Like I say, if you can't pay one, the Twin Falls court will give you one.

OJ: To me? That's fine.

FG: OK. If you want to talk right now without an attorney, if you want to talk to us what [sic] happened tonight, you can talk.

OJ: Yes.

FG: When you want to stop, tell me, "I want to stop" and bring in an attorney. OK?

OJ: Uh huh.

FG: Do you know everything that I have told you?

OJ: Yes.

FG: OK. With all of this, do you want to talk to us what [sic] happened tonight, without an attorney?

OJ: Oh, if I talk with you, will I still have an attorney?

FG: Yes, if you want an attorney, you think you want to stop here, and we stop here, and you say, "I want to speak with an attorney" first.

OJ: OK.

FG: OK. Knowing that, do you want to talk with us what [sic] happened tonight?

OJ: What I, what I say [sic], if, if I talk now with you, afterwards I still won't need an attorney?

OJ: Yes, if you want an attorney, they will still give you one, OK?

FG: That's good.

Thereafter, Jaco spoke with Officer Garcia about the events leading up to Quezada's shooting.[3] At the conclusion of the interview, Officer Garcia requested a written statement from Jaco. Jaco refused to provide one and terminated the interview by invoking his right to counsel.

■ In *State v. Brennan*, this Court addressed the effectiveness of an alleged waiver of counsel, stating: "Although questions of waiver require courts to give a broad interpretation to a defendant's request for counsel, interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." 123 Idaho at 557, 850 P.2d at 206, *citing Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991).

After conducting a thorough review of the record, we agree with the district court's conclusion that Jaco was properly informed of his *Miranda* rights and freely chose to waive them. The interview was conducted in Spanish because Jaco is Spanish-speaking and Officer Garcia is fluent in Spanish. Officer Garcia informed Jaco of his *Miranda* rights and when it was clear that Jaco did not understand certain aspects of those rights, Officer Garcia provided sufficient clarification. When Jaco made ambiguous statements indicating his lack of understanding of his *Miranda* rights, Officer Garcia even went so far as to tell Jaco how he should phrase his request for an attorney if at any time during the interview he wished to invoke his right to counsel. Officer Garcia did not begin questioning Jaco until he had clarified Jaco's understanding of the *Miranda* warnings. In fact, Jaco's decision to invoke his right to counsel when he was asked to provide a written statement indicates that he knew of his right to counsel and how to invoke it. Furthermore, at no time during the interview did Jaco make an unambiguous assertion to his right to counsel. Accordingly, we agree with the district court's finding that Jaco was adequately informed of his *Miranda* rights and that under the totality of the circumstances test, he knowingly, intelligently, and voluntarily waived those rights.

### B. Inadequate Spanish–English Translation of Jaco's Statements

■ For the first time on appeal, Jaco asserts that the Spanish to English translation of his interview with Officer Garcia was inaccurate. Jaco explains that because the identity and qualifications of the individual who interpreted and transcribed the taped interview is unknown, and because Officer Garcia made written alterations to the transcription, it is by virtue thereof inaccurate.

Rule 103 of the Idaho Rules of Evidence provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." *Id.* At no point during the trial did Jaco object to the accuracy of the translation and transcription of the interview tape. In fact, before Officer Garcia testified, defense counsel was asked whether he objected to handwritten changes Officer Garcia had made to the transcribed copy of the interview.[4] Defense counsel stated that to the extent his motion to suppress the interview had been denied, he renewed the prior objections set forth in the suppression motion. With respect to the handwritten changes made to the transcript, however, counsel stated that he had no objection to the alterations.

Jaco's failure to object to the accuracy of the translation below precludes him from raising it as an issue for the first time on

---

3. Jaco's oral statements to the police were as much, if not more, exculpatory than they were incriminatory.

4. After reading a translated written copy of the interview, Officer Garcia made minor handwritten changes to clarify what he believed to be mistakes in the Spanish to English translation.

appeal. *See* I.R.E. 103. Even if Jaco had objected to the accuracy of the translation below, he has failed to provide an adequate record upon which an evaluation of the accuracy of the translation and transcription can be made. *See State v. Beason*, 119 Idaho 103, 803 P.2d 1009 (Ct.App.1991). Accordingly, we decline to address the merits of this issue on appeal.

## C. Misconduct by an Investigative Officer

■ Jaco asserts that an investigative officer suborned perjury and obstructed justice when he intimidated and threatened a defense witness the evening before the witness was scheduled to testify. Officer Dudley was asked to interview Miguel DeDios to determine the substance of his testimony because DeDios had yet to be interviewed about Quezada's death. DeDios was being held at the Twin Falls County Jail on charges unrelated to Jaco's case at the time of the interview. DeDios informed Dudley that he would testify as an eyewitness to the shooting in a manner favorable to Jaco. Dudley then lied to DeDios and told him that an element of his story about the shooting, which was non-essential, was false. Dudley, in fact, had no idea whether this element of DeDios's story was false. Following this assertion by Dudley, DeDios said maybe that portion of his story was not accurate. At that point, Dudley informed DeDios that he could go to prison for perjury if he provided false testimony at trial the next day. DeDios then recanted and told Dudley he did not witness the shooting and was only testifying to help out a friend. The next day, however, DeDios did testify at the trial on behalf of Jaco in conformance with his original story.

*After* the jury returned a guilty verdict, defense counsel filed a motion for mistrial pursuant to I.C.R. 29.1, alleging, *inter alia,* that Dudley's conduct suborned perjury or obstructed justice. In the motion, defense counsel asserted that Dudley attempted to keep DeDios from testifying through threats of imprisonment and lies. The trial court denied the motion on the grounds that the motion was untimely, it was not supported by the transcripts, and counsel did not comply with the requirement to provide notice for a hearing.

On appeal, we agree that the motion was untimely and was properly dismissed by the district court. Defense counsel filed the motion for mistrial on May 22, 1996, a day following the jury's guilty verdict. I.C.R. 29.1 provides that "[a]t any time *during a trial,* the court may declare a mistrial and order a new trial ...." (emphasis added). At no time did defense counsel make a motion for mistrial during the course of this testimony, nor did he object to the testimony of Officer Dudley even though he was aware of Officer Dudley's interview with DeDios and his allegedly inappropriate behavior. Moreover, DeDios did testify and his testimony corroborated Jaco's claim that Quezada's shooting was accidental. Furthermore, defense counsel questioned DeDios about his meeting with Dudley and fully cross-examined Dudley about his allegedly inappropriate interviewing tactics in front of the jury. Jaco did not otherwise raise suborning perjury or obstructing justice as an issue before the trial court. Accordingly, the district court did not err in denying the belated motion for a mistrial.

## D. Prosecutorial Misconduct

■ Jaco alleges that the prosecutor engaged in misconduct by referring to defense witness DeDios as a liar in closing argument. The allegation of prosecutorial misconduct was raised by counsel in his motion for a mistrial. In the order denying the motion, the district court stated that defense counsel's claim of prosecutorial misconduct "greatly over exaggerat[ed] the prosecutor's comments," and that counsel had failed to object to the comments at the time they were made.

■ The appellant bears the burden of establishing a record to substantiate the claims he has set forth on appeal. *State v. Beason*, 119 Idaho 103, 105, 803 P.2d 1009, 1011 (Ct.App.1991). We will not presume error. *Id.* Jaco has failed to make closing arguments a part of the record on appeal. Without a record to support Jaco's claims, we do not know whether the prosecutor engaged in misconduct during closing arguments.

Jaco's failure to support his claim of prosecutorial misconduct precludes this Court from addressing the merits of his claim on appeal.

### E. Sufficiency of the Evidence

 Jaco asserts that the evidence presented at trial was insufficient to support the jury's verdict finding him guilty of second degree murder. A jury verdict will not be disturbed on appeal "if there is substantial evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Boag*, 118 Idaho 944, 947, 801 P.2d 1295, 1298 (Ct.App.1990). The appellate court will not substitute its views for those "of the jury as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence." *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct.App.1991), *citing State v. Decker*, 108 Idaho 683, 701 P.2d 303 (Ct.App.1985). Where a defendant stands convicted, the evidence is viewed in the light most favorable to the state. *State v. Reyes*, 121 Idaho 570, 826 P.2d 919 (Ct.App.1992).

Jaco's argument is premised upon his claim that eyewitness testimony and medical evidence submitted at trial prove that the shooting was accidental. Jaco asserts that in light of the accidental nature of the shooting, the state failed to prove beyond a reasonable doubt that he killed Quezada with malice. Therefore, Jaco claims, the jury's verdict finding him guilty of second degree murder cannot stand.

 Murder is defined by statute as the unlawful killing of a human being with malice aforethought. I.C. § 18–4001. The element of malice may be presumed when a defendant uses a deadly weapon against the person of another in a deadly manner. *State v. Ziegler*, 107 Idaho 1133, 695 P.2d 1272 (Ct. App.1985); *State v. Wolfe*, 107 Idaho 676, 691 P.2d 1291 (Ct.App.1984).

The jury heard conflicting eyewitness testimony that either corroborated or negated Jaco's claim that the shooting was accidental. The pathologist who examined Quezada's body testified that the bullet entered his body "almost vertical or perpendicular to the plane of the body rather than a glancing angle." This testimony corroborates the prosecution's claim that Jaco pointed the gun straight at Quezada and then fired, and refutes Jaco's claim that the gun accidentally discharged from an upward angle as he fell backward.

In addition, with respect to Jaco's claim that the prosecution failed to present sufficient evidence to demonstrate malice, a number of eyewitnesses testified that Jaco used a deadly weapon against both Quezada and Jose Luis Flores in a deadly manner. According to this evidence, Jaco not only fired a warning shot into the air without regard to where the bullet would stray, but also aimed his gun at both Jose Luis and Quezada and pulled the trigger, knowing that some of the chambers were loaded. Such use of a deadly weapon against at least two people, one of whom is shot and killed in this manner, is sufficient to satisfy the malice element necessary to sustain Jaco's second degree murder conviction. *See Ziegler*, 107 Idaho at 1136, 695 P.2d at 1275. We find, therefore, that the jury's verdict is supported by substantial albeit conflicting evidence.

### Conclusion

Jaco's judgment of conviction on the charge of second degree murder enhanced for the use of a deadly weapon and the unified thirty-year sentence, with twenty years fixed, are affirmed.

LANSING, C.J., and PERRY, J., concur.