STATE OF NEBRASKA, APPELLEE, V.
DAVID E. BURDETTE, APPELLANT.
611 N.W. 2d 615

Filed June 9, 2000.    No. S-99-1210.

Thomas C. Riley, Douglas County Public Defender, and Timothy P. Burns for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
David E. Burdette was convicted by a jury in the district court for Douglas County on August 20, 1999, of first degree sexual assault, second offense; attempted first degree sexual assault; robbery; and two counts of burglary. Burdette was found to be a habitual criminal and on September 22, was sentenced to 115 to 220 years' imprisonment. Burdette appeals his convictions and sentences. We affirm.

## II. STATEMENT OF FACTS

In 1982, Burdette was convicted of two counts of first degree forcible sexual assault and one count of attempted first degree forcible sexual assault. On March 31, 1982, an intruder entered the home of C.P. through a back window after pulling a screen off the window. As C.P. was going to bed, the intruder grabbed her from behind and threw her on the bed. He bound her arms and mouth with duct tape and blindfolded her. He then sexually assaulted her both anally and vaginally and took some money from her billfold before leaving the house. C.P. had recently been featured in a local magazine in a list of the 10 most eligible women in Omaha.

On April 19, 1982, P.G. was awakened by an intruder who tied her hands behind her back and blindfolded her before sexually assaulting her anally and vaginally. Before leaving the house, the intruder asked P.G. where her money was located.

On April 25, 1982, an intruder gained entry to the home of J.B. through a sliding glass door. J.B. was awakened in her bedroom by the intruder, who tied her hands with duct tape, blindfolded and gagged her, and then sexually assaulted her anally and vaginally. The intruder went through her billfold and drawers before leaving the house. At one point, the intruder told J.B. he had seen her picture in a magazine article featuring Omaha's 10 most eligible women. In describing the intruder, J.B. told investigators she thought that he was white but that his voice "sounded black." Burdette is white.

In May 1982, Lynn Mason was a deputy sheriff in Douglas County and a member of a task force investigating sexual assaults of women who had been featured in the local magazine article listing the 10 most eligible women in Omaha. Mason was assigned to guard P.M., one of the women featured in the article. On May 10, Mason was inside P.M.'s house at around 2 a.m. when Burdette attempted to cut the screen on a sliding glass door of the house. While attempting to gain access to P.M.'s house, Burdette saw Mason, and Burdette fled. Burdette was later found hiding in the area of P.M.'s house and was arrested.

Burdette pled guilty to the assaults of C.P. and P.G. Burdette was convicted of the attempted first degree sexual assault of P.M.

On December 1, 1982, Burdette received consecutive sentences of 11 to 15 years' imprisonment for each of the sexual assaults and a concurrent sentence of 3 to 5 years' imprisonment for the attempted sexual assault. Burdette served his sentences at the Omaha Correctional Center and was released on April 30, 1998. Upon his release, Burdette registered with the Douglas County sheriff's office pursuant to the Sex Offender Registration Act, Neb. Rev. Stat. §§ 29-4001 to 29-4013 (Cum. Supp. 1998). On June 2, he informed the sheriff's office of a change of address.

In the early morning hours of October 14, 1998, an intruder broke into the rural Douglas County home of A.B. and her two daughters. A.B.'s husband had died in a motorcycle accident on September 30, and October 13 was the first night she and her daughters had stayed by themselves overnight in their home since his death. A.B. had gone to bed with her two daughters at around 10:30 p.m. on October 13. Some time after midnight, A.B. was awakened when the intruder placed his hand, covered in a latex glove, over her mouth. The intruder asked A.B. for her purse and then got A.B. and her daughters out of the bed and led them to the hallway. When A.B. told the intruder her purse was downstairs, the intruder returned A.B. and her daughters to the bed, tied A.B. to her daughters with plastic flexible cuffs, and ordered them to lie face down on the bed.

A.B. then heard the intruder going through the bedroom and other rooms of the house. He subsequently returned to the bedroom, blindfolded and gagged A.B., and tied her legs apart with some ripped sheets. The intruder digitally penetrated A.B. both anally and vaginally and fondled her breasts. A.B. then heard the intruder take off his pants, and he penetrated her with his penis. As he was assaulting A.B., the intruder told her daughters he was not hurting their mother and that "mommy liked this." After 5 to 10 minutes, A.B. heard the intruder say he was not "going to waste the bucket." He then withdrew and put his pants back on. The intruder went downstairs, searched for A.B.'s purse, then returned upstairs before leaving to hit A.B. and her daughters on the buttocks and to tell them not to call the police or he would kill them.

After the intruder left, A.B. freed herself and called her brother-in-law at approximately 2 a.m. She then called the 911 emergency dispatch service. A.B.'s brother-in-law and a deputy sheriff arrived shortly thereafter. A.B. was unable to identify the intruder because she never got a good look at him, but based on the sound of his voice, she thought he might be a black male. She also noted that he smelled of cigarette smoke. A.B. determined that some money and a gun were taken from her home. Investigators determined that the home had been entered through a window in the living room where a screen had been ripped off the frame.

The following day, after hearing about the break-in and assault, Jane Frost, a neighbor of A.B.'s, reported to the sheriff's office that she was driving home at around 12:30 a.m. on October 14, 1998, and noticed a black Ford Bronco with a red stripe parked on the side of the road by the driveway to A.B.'s home. Frost reported that she slowed down and read the license plate number which she thought to be "1-H8 . . . [a]nd . . . possibly a seven."

On October 17, 1998, a deputy sheriff saw a black Ford Bronco with a red stripe and a license plate number of 1-HH87 heading west on Maple Street. The deputy pulled the vehicle over because of a traffic violation and because the vehicle matched the description of the vehicle observed by Frost. The driver of the vehicle was Burdette, and Burdette identified himself to the deputy as a registered sex offender. The deputy passed the information on to investigators in the sheriff's department.

When that information reached investigators, Burdette became a suspect in the assault of A.B. Investigators began a 24-hour surveillance on Burdette on October 22, 1998, and obtained a court order from the district court for Douglas County on October 24 to install a tracking device on Burdette's vehicle. Investigators learned that subsequent to the time Burdette had completed his sex offender registration, he had changed his employer and his vehicle. In order to gain access to Burdette's vehicle to install the tracking device, investigators put out a "locate" to have Burdette stopped in his vehicle and to have investigators notified when he was stopped.

At around 5 p.m. on October 27, 1998, in reliance on the locate, deputy sheriffs stopped Burdette in his vehicle and notified two of the investigators, Deputy Sheriff William Jackson and Deputy Sheriff John Pankonin. Although the stop was based on the locate, one of the deputy sheriffs told Burdette that the stop was for the purpose of having Burdette update his sex offender registration. Jackson and Pankonin proceeded to the area where Burdette had been stopped. Jackson requested that Burdette come to the sheriff's headquarters in order to update his sex offender registration. Burdette agreed to ride with the deputies to the headquarters. Burdette's vehicle was towed to the impound lot, where an electronic tracking device was installed on the vehicle.

As the tracking device was being installed, Burdette was at the sheriff's headquarters completing the sex offender registration. Pankonin began Burdette's registration process with a blank form and went over the questions with Burdette. Pankonin asked Burdette only those questions that were on the registration form. Burdette answered the questions and volunteered additional information. Burdette told Pankonin about the sexual assaults he had committed in 1982. Burdette stated that in 1982, Burdette and his girl friend saw an issue of a local magazine featuring a list of the most eligible women in Omaha. Burdette told his girl friend the women on the list were probably better than the girl friend, and she replied that he would never know. Burdette told Pankonin that he took her reply as a challenge and that he proceeded to rape two or three of the women on the list.

Burdette went on to tell Pankonin that in 1998, he was 43 years old, and that he was too old and not in good enough shape to do something like that again. However, Burdette told Pankonin that during the 1982 sexual assaults, he was not wearing a condom but that in 1998, he would wear a condom because of sexually transmitted diseases and because police would need only a small sperm sample to make a DNA identification. Burdette also told Pankonin that during the 1982 assaults, he did not use a weapon because he believed he could physically overpower the victims with his hands and did not need a weapon.

As Pankonin went over the questions with Burdette, Jackson monitored the progress of the installation of the tracking device.

When Jackson received word that the tracking device had been installed, he and Pankonin transported Burdette to his vehicle at the impound lot.

With respect to the assault on A.B., investigators developed a theory that the intruder had found A.B.'s name by reading her husband's obituary in the Omaha World-Herald newspaper. During the 6 weeks following installation of the tracking device, investigators noticed Burdette would frequently drive slowly through and stop in certain neighborhoods in the Omaha area. Investigators were able to link nine of the areas to which Burdette paid particular attention to recent obituary notices in the Omaha World-Herald regarding men who had died and had been survived by their wives.

On November 25, 1998, investigators observed Burdette driving several times past the home of S.H. Investigators reviewed the previous day's edition of the Omaha World-Herald and found an obituary for S.H.'s husband. Burdette returned to the area of S.H.'s house five more times between November 26 and 28.

When investigators followed Burdette to the area of S.H.'s home on November 28, 1998, they saw him get out of his vehicle, walk around the house, and then leave the area. After Burdette left the area, Jackson approached S.H., explained the situation to her, and assured her Burdette was being watched. Jackson walked around the house with S.H., and Jackson noted that gates on each side of the house and a sliding screen door in the back of the house had been opened and were ajar.

Jackson left S.H.'s house some time after 11 p.m. When he got into his vehicle, Jackson was advised over the radio that Burdette had been observed heading back toward the area of S.H.'s house. Jackson returned to S.H.'s house and asked if he could wait inside her house in case Burdette returned. S.H. agreed, and Jackson waited inside the house near the sliding screen door that had been found partially open. Jackson left both the sliding glass and screen doors closed but unlocked. Jackson waited a short time and was advised by radio that Burdette had parked in an apartment complex parking lot near S.H.'s house. Shortly past midnight on November 29, 1998, Jackson heard noises in the backyard and could see someone on the back deck.

Jackson then heard the sliding doors open and saw Burdette part the blinds and enter the house.

After Burdette got inside the house, Jackson confronted him and told him he was under arrest. Burdette turned and attempted to run, but Jackson subdued him on the deck. Jackson brought him back inside and notified the other officers. At the time he entered the house, Burdette was wearing latex rubber gloves and had rope and two condoms in his possession.

In a six-count information, Burdette was charged with first degree sexual assault, second offense; burglary; and robbery in connection with the October 14, 1998, incident at A.B.'s house, and with attempted first degree sexual assault and burglary in connection with the November 29 incident at S.H.'s house. In the sixth count, Burdette was further charged as being a habitual criminal.

Prior to trial, the State gave notice that it intended to present evidence of the 1982 sexual assaults committed by Burdette. A hearing pursuant to Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Reissue 1995), was held on June 15, 1999, during which evidence of the 1982 sexual assaults was presented. On June 29, 1999, the district court entered an order allowing the State to present evidence of the prior sexual assaults at trial. In the order, the court found that "evidence of the 1982 assaults [had] independent relevance"; that "admitting the previous bad acts evidence [was] for the proper purpose of showing identity, motive and opportunity"; and that the probative value of such evidence for such purposes outweighed its potential for unfair prejudice.

On July 16, 1999, this court's decision in *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999), was announced, requiring the State and the district court to state on the record the specific purpose or purposes for which evidence of prior bad acts is admissible. A further hearing was held on August 16, during which the State urged that evidence of Burdette's 1982 sexual assaults be admitted for the purposes of proving intent, motive, and identity. The State argued that intent and motive were at issue in regard to the charges of attempted first degree sexual assault and burglary in connection with the November 29, 1998, incident at S.H.'s house. The court stated that the conclusions set

forth in its June 29, 1999, order were still applicable and that when requested to do so during the trial, it would give limiting instructions that the evidence would be used only for the purposes of intent, motive, and identity.

Also prior to trial, Burdette filed a motion to suppress the statements he made to Pankonin on October 27, 1998, because such evidence was received in violation of his constitutional rights under the Fourth and the Fifth Amendments to the U.S. Constitution and under article I, §§ 7 and 12, of the Nebraska Constitution. Burdette argued that the statements were obtained during a custodial interrogation during which the deputy sheriffs had failed to inform him of his *Miranda* rights and that the statements were obtained without a voluntary and intelligent waiver of his right against self-incrimination and his right to counsel. Burdette further argued that the statements were not freely and voluntarily given and that they were produced by, or as the result of, threats and coercion.

A hearing was held on the motion to suppress on June 14, 1999. On June 29, the district court entered an order denying the motion to suppress and finding that the statements given by Burdette to Pankonin were voluntary and not in violation of Burdette's right against self-incrimination. In its order in conformity with *State v. Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996), the district court found that law enforcement officers properly stopped Burdette for the purpose of updating his sex offender registration, that *Miranda* warnings were not required as Burdette was not in custody for interrogation purposes, that Burdette voluntarily accompanied officers to the sheriff's headquarters, and that the questioning of Burdette did not go beyond the questions on the standard sex offender registration form. The district court found that a reasonable person would have felt he was at liberty to end the questioning and leave.

At trial, J.B., C.P., P.G., Mason, Jackson, and Pankonin testified regarding Burdette's 1982 sexual assaults. Prior to such testimony, the district court instructed the jury that the evidence was admitted for the limited purposes of showing Burdette's motive or intent or to establish his identity and that such evidence was not admissible to prove Burdette's character or his propensity to act in a certain way. Burdette objected to such testimony.

Pankonin testified as to Burdette's statements on October 27, 1998. Burdette objected and reasserted the arguments originally made in his motion to suppress. Burdette's objection was overruled, and Pankonin was allowed to testify regarding Burdette's statements.

On August 20, 1999, the jury returned verdicts of guilty on all five substantive counts. A hearing was held September 22, during which the district court determined that Burdette was a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 1995) and that all five charges, including the charge of first degree sexual assault, second offense, were felonies, the sentences of which were to be imposed pursuant to the habitual criminal statute. The district court determined that the penalty for the charge of first degree sexual assault, second offense, pursuant to § 29-2221(1)(a) was a potential sentence of 25 to 60 years' imprisonment with a mandatory minimum of 25 years' imprisonment and that the penalty for each of the four other charges pursuant to the habitual criminal statute was a potential sentence of 10 to 60 years' imprisonment with a mandatory minimum of 10 years' imprisonment. Pursuant to such findings, the district court sentenced Burdette on count I to 35 to 60 years' imprisonment for the first degree sexual assault, second offense, and to 20 to 40 years' imprisonment on each of the other four charges, for a total sentence of 115 to 220 years' imprisonment. Burdette appeals.

## III. ASSIGNMENTS OF ERROR

Burdette assigns error to the district court's (1) admission of evidence of the 1982 sexual assaults committed by Burdette; (2) admission of evidence of statements Burdette made to Pankonin on October 27, 1998; and (3) sentencing Burdette as a habitual criminal on count I, the charge of first degree sexual assault, second offense, because such charge had already been enhanced pursuant to Neb. Rev. Stat. § 28-319(3) (Reissue 1995).

## IV. STANDARDS OF REVIEW

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those

instances under the rules when judicial discretion is a factor involved in determining admissibility. *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995) and rule 404(2), and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Sanchez, supra*; *State v. McManus, supra*.

▮ A trial court's ruling on a motion to suppress based on the Fourth Amendment, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Konfrst, supra*. The foregoing standards of review were derived from *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), and first applied by the Nebraska Supreme Court in *Konfrst*, which was a Fourth Amendment case.

▮ Motions to suppress statements based on the Fifth Amendment involve a determination of whether an individual was "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The determination of whether an individual was "in custody" is made by reference to the circumstances of the interrogation and an analysis of whether a reasonable person would have felt that he or she was at liberty to terminate the interrogation. *State v. Veiman*, 249 Neb. 875, 546 N.W.2d 785 (1996). With respect to motions to suppress based on alleged violations of the Fifth Amendment, the U.S. Supreme Court held in *Thompson v. Keohane*, 516 U.S. 99, 116

S. Ct. 457, 133 L. Ed. 2d 383 (1995), that whether a suspect is "in custody," and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact. We note that, in reliance on *Thompson*, other appellate courts have extended the *Ornelas* standards of review to appellate review of motions to suppress based on the Fifth Amendment involving the failure to give *Miranda* warnings. See, e.g., *U.S. v. Erving L.*, 147 F.3d 1240 (10th Cir. 1998); *U.S. v. Fernandez-Ventura*, 132 F.3d 844 (1st Cir. 1998); *U.S. v. Yusuff*, 96 F.3d 982 (7th Cir. 1996). See, also, *U.S. v. Howard*, 115 F.3d 1151 (4th Cir. 1997); *U.S. v. Morgan*, 91 F.3d 1193 (8th Cir. 1996); *Feltrop v. Bowersox*, 91 F.3d 1178 (8th Cir. 1996). See, also, *State v. Wiernasz*, 584 N.W.2d 1 (Minn. 1998); *In re Joshua David C.*, 116 Md. App. 580, 698 A.2d 1155 (1997). See, also, *State v. McCurry*, 5 Neb. App. 526, 561 N.W.2d 244 (1997). We now adopt the *Thompson-Ornelas* standard of review with respect to motions to suppress statements based on Fifth Amendment grounds as follows: In reviewing a motion to suppress statements to determine whether an individual was "in custody" for purposes of *Miranda*, findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error, and the determination of whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave is reviewed de novo.

Sentences within statutory limits will be disturbed by an appellate court only if the sentence complained of was an abuse of judicial discretion. *State v. Burkhardt*, 258 Neb. 1050, 607 N.W.2d 512 (2000). To the extent questions of law are involved, an appellate court is obligated to reach conclusions independent of the decisions reached by the courts below. *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000).

## V. ANALYSIS

### 1. OTHER CRIMES EVIDENCE

Burdette first assigns error to the district court's admission of evidence of the sexual assaults Burdette committed in 1982. He asserts the admission of such evidence violated rule 404(2), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he

or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ In reviewing the admissibility of other crimes evidence under rule 404(2), we consider whether (1) the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith, (2) the probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (3) the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). We apply this analysis in our review of the admissibility of evidence of Burdette's prior sexual assaults in the present case.

■ The proponent of evidence offered pursuant to rule 404(2), upon objection to its admissibility, is required to state on the record the specific purpose or purposes for which the evidence is being offered, and the trial court is required to state on the record the purpose or purposes for which such evidence is received. *State v. Sanchez, supra*. Any limiting instruction given upon receipt of such evidence should likewise identify only those specific purposes for which the evidence was received. *Id.*

In the instant case, the district court made a finding on the record that evidence of Burdette's prior sexual assaults was admissible for the purposes of proving motive, intent, and identity. The district court gave the jury limiting instructions at the time evidence of the prior sexual assaults was presented. In view of the above, we review the admissibility of other crimes evidence by considering whether evidence of the 1982 sexual assaults was relevant for the purposes asserted by the district court.

### (a) Motive and Intent

■ The district court found, and instructed the jury, that evidence of the 1982 sexual assaults was admissible to show Burdette's motive and intent in committing the charged crimes. We have held that other crimes evidence may be offered for the

purpose of proving intent where intent is an element of the charged offense. See, e.g., *State v. Styskal*, 242 Neb. 26, 493 N.W.2d 313 (1992). Motive is defined as that which leads or tempts the mind to indulge in a criminal act. *State v. Sanchez, supra*. Even when proof of motive is not an element of a crime, motive for the crime charged is relevant to the State's proof of the intent element. See, *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). Therefore, to the extent intent is an element of the current crimes charged against Burdette and to the extent evidence of the 1982 sexual assaults is relevant to show Burdette's motive and intent in committing the current crimes charged, evidence of the prior crimes to prove motive and intent is admissible under rule 404(2).

Although specific intent need not be proved with respect to the first degree sexual assault charge, the State was required to prove specific intent with respect to the four remaining substantive charges. First degree sexual assault under § 28-319(1)(a) is a general intent crime. The burden on the prosecution in order to establish the general criminal intent required for first degree sexual assault is to prove beyond a reasonable doubt that the accused subjected another person to sexual penetration and overcame the victim by force, threat of force, coercion, or deception. *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998). Intent was therefore not an issue in regard to the charge of first degree sexual assault of A.B.

However, Burdette was also charged with committing robbery in violation of Neb. Rev. Stat. § 28-324 (Reissue 1995). Section 28-324 provides that "[a] person commits robbery if, *with the intent to steal,* he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." (Emphasis supplied.) Burdette was further charged with two counts of burglary in violation of Neb. Rev. Stat. § 28-507 (Reissue 1995). Section 28-507 provides that "[a] person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon *with intent to commit any felony or with intent to steal* property of any value." (Emphasis supplied.) Finally, Burdette was charged with the

attempted first degree sexual assault of S.H. pursuant to Neb. Rev. Stat. § 28-201 (Cum. Supp. 1998) and § 28-319(1)(a). Section 28-201(1) provides that "[a] person shall be guilty of an attempt to commit a crime if he . . . [*i*]*ntentionally engages in conduct* which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct *intended to culminate in the commission of the crime.*" (Emphasis supplied.)

The State was required to prove Burdette's specific intent with regard to four charges. On the robbery charge, the State was required to prove that Burdette intended to steal when he took the money and the gun from A.B. On the two burglary charges, the State was required to prove that Burdette intended to commit a felony or to steal property when he broke into the homes of both A.B. and S.H. On the attempted first degree sexual assault charge, the State was required to prove that Burdette's breaking into S.H.'s home on November 29, 1998, was conduct intended to culminate in the commission of first degree sexual assault upon S.H.

Evidence of the 1982 sexual assaults was relevant to prove Burdette's intent and motive in connection with each of these four charges. Burdette's prior pattern of selecting victims from an article which identified them as women likely to be living alone and then breaking into their homes to commit sexual assaults and to steal was highly probative of his motive and intent in breaking into A.B.'s and S.H.'s houses. Because intent was an element of four of the charged crimes and evidence of the 1982 sexual assaults was probative of Burdette's motive and intent in connection with those charges, the district court did not abuse its discretion by admitting such evidence for these purposes.

### (b) Identity

The district found and instructed that evidence of the 1982 sexual assaults was admissible for the purpose of establishing Burdette's identity as the intruder at A.B.'s house. In certain circumstances, we have found that significant similarities in the manner in which a defendant carried out a prior bad act make evidence of the prior act useful for the proper purpose of

establishing identity. In such cases, we have said that "[t]he question is whether the crimes are so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature." *State v. Carter*, 246 Neb. 953, 965, 524 N.W.2d 763, 773 (1994), *overruled on other grounds, State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997).

The district court in this case found that the 1982 sexual assaults and the current charged crimes were sufficiently similar that evidence of the prior acts was admissible for the purpose of proving identity. Among the similarities noted by the district court were that in 1982, Burdette

used force to break into the homes of victims during early morning hours, that [Burdette] wanted money from the victims, that [Burdette] gagged, blindfolded and tied the victims face down on their beds, that [Burdette] attempted to orally, anally and vaginally assault the victims, and that the victims were chosen from an article in the Omaha Magazine featuring 1982's most eligible women.

The district court noted that in regard to crimes committed against A.B., the State charged that Burdette

used force to break into the home of the victim during early morning hours, he wanted money from the victim, he gagged, blindfolded and tied the victim face down on the bed, he assaulted the victim anally and vaginally, and the victim was chosen from a newspaper article reporting the recent death of her husband.

In *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999), we rejected the State's assertion that other crimes evidence was admissible under the circumstances of that case for the purpose of establishing identity. We distinguished *Sanchez* from *Carter* and *Freeman* on the basis that in *Carter* and *Freeman*, there was physical evidence that a sexual assault had occurred but no eyewitness identification of the assailant, thus leaving open the possibility that someone other than the defendant had committed the crime. Other crimes evidence in *Carter* and *Freeman* was therefore found probative of the identity of the assailant and properly admitted for that purpose. In *Sanchez*, identity was not an issue. In *Sanchez*, there was no physical evidence to establish sexual assault, only the testi-

mony of the victim who described what happened and unequivocally identified the defendant as the assailant. In *Sanchez*, there was no evidence upon which the jury could have concluded the assault occurred but that someone other than the defendant committed it.

In the present case, A.B. testified that she was sexually assaulted but that she did not see the intruder and was unable to unequivocally identify Burdette as the intruder. A.B. testified that after the assault, she told investigators that based on the sound of his voice, she thought the intruder might have been black. Because Burdette is white, it was possible that the jury could have concluded that A.B. was sexually assaulted but that someone other than Burdette committed the crimes charged. Therefore, unlike *Sanchez*, but similar to *Carter* and *Freeman*, identity was at issue in the instant case.

We conclude that evidence of the 1982 sexual assaults was admissible for the purpose of proving the identity of Burdette as the person who committed the first degree sexual assault, robbery, and burglary at A.B.'s home. Significant similarities, as listed by the district court, existed between the assaults Burdette committed in 1982 and the charged crimes involving A.B. Indeed, the fact that, with the exception of one of the victims in 1982, the assailant chose victims whose names had been featured in articles identifying them as women who would likely be living alone was "unusual and distinctive" such that it could be said that the 1982 sexual assaults and the crimes charged in the instant case bore "the same signature." See *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), *overruled on other grounds, State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). See, also, *State v. Rutchik*, 116 Wis. 2d 61, 341 N.W.2d 639 (1984) (finding that evidence that defendant had previously chosen residences to burglarize by reading obituary column was probative to establish definite method of operation and was therefore admissible to show preparation, plan, identity, and intent). Because identity was at issue in this case and evidence of the 1982 sexual assaults was probative of that issue, the district court did not abuse its discretion in admitting the evidence of the 1982 sexual assaults for the purpose of proving Burdette's identity as the intruder.

## (c) Probative Value and Unfair Prejudice

Having found that evidence of Burdette's 1982 sexual assaults was relevant for proper purposes under rule 404(2), we next consider whether the probative value of such evidence is substantially outweighed by its potential for unfair prejudice. In this regard, Burdette argues that the probative value of the evidence was significantly diminished by the fact that the prior sexual assaults occurred in 1982, 16 years prior to the crimes charged. Burdette argues that remoteness in time caused the potential for unfair prejudice to substantially outweigh the probative value of the evidence.

The admissibility of evidence concerning prior bad acts under rule 404(2) must be determined upon the facts of each case; no exact limitation of time can be fixed as to when prior acts are too remote to be admissible. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). The question of whether evidence of prior acts otherwise admissible under rule 404(2) is too remote in time is largely within the discretion of the trial court. While remoteness in time may weaken the probative value of evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence. *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990).

In the instant case, we find that the district court did not abuse its discretion in concluding that the probative value of evidence of the 1982 sexual assaults was not substantially outweighed by the potential for unfair prejudice despite the fact that the prior acts occurred 16 years prior to the crimes charged. Particularly relevant to consideration of the effect of remoteness in time is the fact that during most of the 16 years between the prior assaults and the charged crimes, Burdette was in prison. See *State v. Rutchik*, 116 Wis. 2d at 75, 341 N.W.2d at 646 (stating that "in assessing the impact of the passage of time on the relevancy of prior crimes evidence, periods of confinement will not be included in computing the time between incidents").

We conclude that evidence of Burdette's 1982 sexual assaults was relevant for the proper purposes of proving identity, motive, and intent and that the probative value of such evidence was not outweighed by the potential for unfair prejudice. We further note that the district court properly instructed the jury to limit use of

the prior crimes evidence to determining identity, motive, and intent. We conclude that the trial court did not abuse its discretion by admitting evidence of Burdette's 1982 sexual assaults, and we therefore reject Burdette's first assignment of error.

## 2. Statements Made to Pankonin

As his second assignment of error, Burdette asserts that the district court improperly admitted testimony of statements he made to Pankonin on October 27, 1998, because such statements were obtained in violation of his constitutional rights. Burdette argues that his constitutional rights were violated in two respects: (1) The initial stop was an unlawful seizure under the Fourth Amendment and article I, § 7, of the Nebraska Constitution and (2) the statements were obtained during a custodial interrogation prior to which the officers had failed to give Burdette *Miranda* warnings in violation of the Fifth Amendment and article I, § 12, of the Nebraska Constitution. The district court denied Burdette's motion to suppress and determined that Burdette was properly stopped for the purpose of updating his sex offender registration and that Burdette was not "in custody" at the time he made the statements to Pankonin. Although we do not find it necessary to address the district court's conclusion that Burdette was properly stopped for the purpose of updating his sex offender registration, we conclude that the district court properly denied the motion to suppress because Burdette was properly stopped pursuant to a locate based on reasonable suspicion and Burdette was not "in custody" for *Miranda* purposes when he made the statements to Pankonin.

### (a) Fifth Amendment: Alleged Custodial Interrogation

We first address Burdette's assertion that the statements were obtained in violation of the Fifth Amendment and that the district court erred when it concluded that Burdette was not "in custody" at the time he made the statements to Pankonin. The U.S. Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that in order to safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects interrogated while in police custody must be told that they have the right to remain silent,

that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

The U.S. Supreme Court set forth the standards governing a state court's determination of when an individual is "in custody" in *Thompson v. Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). Two discrete inquiries are essential to the determination: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave. The first inquiry is distinctly factual, while the second calls for application of the controlling legal standard to the historical facts. *Id.* See, also, *State v. Veiman*, 249 Neb. 875, 546 N.W.2d 785 (1996).

Police officers are not required to administer *Miranda* warnings to everyone whom they question, or simply because the questioning takes place in a police station, or because the questioned person is one whom the police suspect. Rather, *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." One is in custody for *Miranda* purposes when there is a formal arrest or a restraint on one's freedom of movement of the degree associated with such an arrest. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). See, also, *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). What is dispositive in determining whether *Miranda* warnings should have been issued is whether a reasonable person would have felt free to leave under the circumstances. *State v. Veiman, supra.*

The district court in the instant case found the circumstances surrounding Burdette's questioning on October 27, 1998, to be as follows:

[W]hen law enforcement officers requested that [Burdette] update the form, [Burdette] voluntarily accompanied the officers to the police station to complete the form, riding with the officers in their car to the station. The officers tes-

tified that [Burdette] was cooperative, that no threats were made, and that handcuffs were not used. . . . [T]he only questions asked of [Burdette] were the standard questions on the Sexual Offender Registration Form. The officers testified that if [Burdette] had refused to update the form at the time he was stopped, they would have allowed him to leave.

The record of the suppression hearing supports the district court's factual findings regarding the circumstances surrounding the questioning. We have reviewed the district court's factual findings for clear error and find none. Burdette presented no evidence that would contradict the district court's finding that he voluntarily accompanied Jackson and Pankonin to the sheriff's headquarters and that his statements to Pankonin were given voluntarily. Jackson and Pankonin testified that Burdette willingly accompanied them in their vehicle and did not ask to drive himself to the sheriff's headquarters. Neither did he at any time ask to end the interview or to be allowed to leave. Burdette put on no evidence to refute this testimony.

We have reviewed the record and, upon our de novo review of the district court's conclusion, agree with the district court that as to the second inquiry under *Thompson* and under the circumstances, a reasonable person would have felt that he or she was at liberty to end the questioning and leave. Burdette went to the sheriff's headquarters voluntarily, and there was no evidence to indicate that Burdette attempted to end the questioning and was prevented from doing so. For purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Burdette was not "in custody" when he made the statements on October 27, 1998, and therefore the statements were not obtained in violation of his Fifth Amendment rights.

### (b) Fourth Amendment: Alleged Illegal Seizure

Although Burdette's statements to Pankonin were voluntary and were not obtained in violation of his Fifth Amendment rights, the statements were obtained as a result of the stop of Burdette's vehicle made by deputy sheriffs based on the locate put out by investigators. The next issue we must resolve is whether Burdette's voluntary statements following this stop

should nevertheless have been suppressed because they were the product of an illegal seizure and therefore excluded as " 'fruit of the poisonous tree,' " under *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The provisions of both the Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, protect against unreasonable seizures. We have recognized three levels of police-citizen encounters:

> "The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but rather the voluntary cooperation of the citizen is elicited through non-coercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of fourth amendment protection. . . . The second category, the investigative stop, is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a 'seizure' sufficient to invoke fourth amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. . . . The third type of police-citizen encounters, arrests, are characterized by highly intrusive or lengthy search or detention. The fourth amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime."

(Citations omitted.) *State v. Van Ackeren*, 242 Neb. 479, 486-87, 495 N.W.2d 630, 636 (1993), quoting *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984).

The officers' stop of Burdette on October 27, 1998, was an encounter of the second type. The officers stopped Burdette's vehicle and briefly detained him until Jackson and Pankonin arrived at the scene. Police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000).

█ As discussed above in connection with our Fifth Amendment analysis, after Jackson and Pankonin arrived at the scene, Burdette voluntarily accompanied them to the sheriff's headquarters. Burdette was not "seized" when Jackson and Pankonin took him to the sheriff's headquarters because one who voluntarily accompanies law enforcement officers for questioning has not been seized for Fourth Amendment purposes. See *State v Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996). However, the investigators gained Burdette's compliance as a result of the initial stop. If the stop was an illegal seizure, the statements Burdette made to Pankonin were "fruit of the poisonous tree" requiring suppression. *Wong Sun v. United States, supra.*

We note that in denying the motion to suppress, the district court determined that the deputy sheriffs properly "stopped [Burdette] for the purpose of updating his Sexual Offender Registration form." In reviewing the factual record, it is clear that a locate had been put out on Burdette and that a stop would permit law enforcement officers to install a tracking device as part of their investigation of Burdette as a suspect in the felonies committed against A.B. The investigators could not disclose such purpose to Burdette and therefore told him he was stopped to update his sex offender registration. What is relevant to our analysis is the propriety of the stop for its actual purpose rather than for the purpose which the investigators represented to Burdette. We, therefore, consider whether the stop was proper for the purpose of investigating Burdette as a suspect in the felonies committed against A.B. and do not decide whether the stop was proper for the purpose of updating the sex offender registration. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis not needed to adjudicate case and controversy before it).

█ Under the undisputed facts and the applicable law, the initial stop of Burdette on October 27, 1998, was proper pursuant to the standards set forth in *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). In *Hensley*, the U.S. Supreme Court stated:

> Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth

Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.

469 U.S. at 226. If police have a reasonable suspicion, grounded in specific and articulable facts, that a person was involved in or is wanted in connection with a completed felony, then a stop may be made to investigate that suspicion. *United States v. Hensley, supra.*

In the instant case, the deputy sheriffs stopped Burdette's vehicle on the basis of a locate put out by the investigators who had information that Burdette and his vehicle were connected to the felonies involving A.B. The U.S. Supreme Court held in *Hensley* that

if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, . . . to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

(Citation omitted.) 469 U.S. at 232. If police make a stop "in objective reliance on a flyer or bulletin . . . the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop." 469 U.S. at 233. Based on *Hensley*, we have held that it is irrelevant whether an officer making a stop in reliance on a radio bulletin is personally aware of the factual foundation for the bulletin, so long as the factual foundation underlying the bulletin is sufficient to support a reasonable suspicion. *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997). In a similar vein, it has also been held that an arrest for which probable cause exists, regardless of whether or not the arresting officer is personally aware of all the facts supporting probable cause, will be deemed a proper arrest. See *State v. Hayes*, 3 Neb. App. 919, 535 N.W.2d 715 (1995).

In the instant case, the deputy sheriffs who stopped Burdette in his Bronco did so in objective reliance on a locate put out by the investigators. The investigators who issued the locate had a rea-

sonable suspicion that the driver of the Bronco was involved in the sexual assault, burglary, and robbery at A.B.'s house. The question therefore is not whether the deputy sheriffs who made the stop based on a locate personally possessed reasonable suspicion, but, rather, whether the investigators who put out the locate had reasonable suspicion, grounded in specific and articulable facts, that the driver of the Bronco was involved in or was wanted in connection with a completed felony. See, *State v. Soukharith, supra; State v. Schwartz,* 239 Neb. 84, 474 N.W.2d 461 (1991) (officer had reasonable suspicion to stop vehicle which answered description of vehicle reported involved in robbery). In this case, investigators possessed information that a neighbor had seen a Bronco parked near A.B.'s house on the night of the crime. Specifically, the neighbor reported seeing a black Bronco with the same description as Burdette's and reported that the license plate number was "1-H8 . . . [a]nd . . . possibly a seven." The license plate number of Burdette's black Bronco was 1-HH87. Burdette had been linked to this vehicle in the traffic stop of October 17, 1998. The investigators who put out the locate, therefore, had reasonable suspicion sufficient to justify briefly detaining the driver of the vehicle for investigative purposes.

The district court found that the deputy sheriffs properly stopped Burdette for the purpose of updating his sex offender registration. Burdette asserts the stop was illegal because the address information on Burdette's registration was up to date and he was not required to update any other information until after his registration anniversary date, which had not yet passed. Because the police stopped Burdette for the purpose of investigating Burdette as a suspect in the sexual assault, robbery, and burglary at A.B.'s house based on a locate which was grounded on sufficient reasonable suspicion, the stop was proper.

The record shows that the stop enabled investigators to place a tracking device on Burdette's vehicle pursuant to a court order. So long as the stop was otherwise proper, the stop was not made invalid because the investigators did not disclose this objective to Burdette. It is fundamental that a statement must be suppressed if it is obtained by offensive police practices. *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997). However, mere deception will not render a statement involuntary or unreliable;

the test for determining the admissibility of a statement obtained by police deception is whether that deception produced a false or untrustworthy confession or statement. *Id.* Nothing in this record indicates that Burdette's statement of October 27, 1998, was false or untrustworthy.

Because Burdette's vehicle was identified in connection with recent felonies and Burdette was a suspect in the recent felonies, we conclude that the deputy sheriffs' stop of Burdette's vehicle based on a proper locate did not violate the Fourth Amendment and did not poison Burdette's subsequent voluntary statements. We conclude there was no violation of Burdette's constitutional rights in connection with his statements to Pankonin on October 27, 1998. The district court properly admitted Burdette's statements of October 27 into evidence. We therefore reject Burdette's second assignment of error.

### 3. Sentencing as Habitual Criminal

Burdette claims generally that the district court erred because it doubly enhanced his sentence. Burdette specifically claims that given the fact that the first degree sexual assault with which he was charged and convicted in count I was first degree sexual assault, second offense, the district court erred when it sentenced him on count I as a habitual criminal. Burdette misperceives the sentencing structure applicable to count I.

Burdette was convicted of first degree sexual assault, second offense, for which the sentence found in § 28-319(3) ordinarily applies. Section 28-319(3) provides:

> Any person who is found guilty of sexual assault in the first degree for a second time when the first conviction was pursuant to this section or any other state or federal law with essentially the same elements as this section shall be sentenced to not less than twenty-five years and shall not be eligible for parole.

However, § 28-319(3) did not apply to Burdette's sentencing because Burdette was found to be a habitual criminal, one of whose prior felonies was a first degree sexual assault, and he was instead sentenced under § 29-2221(1)(a), the habitual criminal statute specifically applicable to a defendant with such a criminal record.

Burdette was charged in count VI as a habitual criminal under § 29-2221. Section 29-2221 does not create a separate offense, but, rather, provides for enhanced punishment where a defendant is found to be a "habitual criminal." Under § 29-2221(1), a defendant convicted of a felony may be deemed a habitual criminal if the defendant has been (1) twice previously convicted of a crime, (2) sentenced, and (3) committed to prison for terms of not less than 1 year each. Generally, one deemed to be a habitual criminal shall be punished by imprisonment for a mandatory minimum term of 10 years and a maximum term of not more than 60 years upon each conviction for a felony committed subsequent to the prior convictions used as the basis for the habitual criminal charge. However, another portion of the habitual criminal sentencing statute, § 29-2221(1)(a), provides a specific provision which controls the habitual criminal sentencing where the defendant is convicted of one of the listed felonies, in this case, first degree sexual assault, second offense, under § 28-319, and has as one of his or her prior felonies one of the listed felonies, in this case, § 28-319. Section 29-2221(1)(a) provides:

> If the felony committed is in violation of section 28-303, 28-304, 28-308, 28-313, *28-319*, 28-502, 28-929, or 28-1222, and at least one of the habitual criminal's prior felony convictions was for a violation of one of the sections listed in this subdivision or of a similar statute in another state or of the United States, the mandatory minimum term shall be twenty-five years and the maximum term not more than sixty years.

(Emphasis supplied.) It is the habitual criminal sentencing statute found at § 29-2221(1)(a) which specifically applies to Burdette, and the district court properly applied this section when it imposed a sentence of 35 to 60 years' imprisonment on Burdette's conviction on count I.

Burdette argues that sentencing him as a habitual criminal on the count of first degree sexual assault, second offense, was a double enhancement of his penalty. We do not agree.

Burdette cites to *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999), for the proposition that the State cannot, in effect, doubly enhance a defendant's criminal conviction. In *Hittle*, we held that a conviction for driving under a suspended license in violation of

Neb. Rev. Stat. § 60-6,196(6) (Reissue 1998), which was deemed to be a felony rather than a misdemeanor, may not be used either to trigger application of the habitual criminal statute or as a prior offense for purposes of penalty enhancement pursuant thereto. We noted that a "defendant should not be subjected to double penalty enhancement through application of both a specific subsequent offense statute and a habitual criminal statute" and that "the specific enhancement mechanism contained in Nebraska's [driving under the influence] statutes precludes application of the general enhancement provisions set forth in the habitual criminal statute." *State v. Hittle*, 257 Neb. at 355, 598 N.W.2d at 29.

A comparison of the interplay of the habitual criminal statute and § 28-319 in the instant case with the habitual criminal statute and the driving under a suspended license statutes in *Hittle* shows marked differences. Section 60-6,196(6), at issue in *Hittle*, provided that a person is guilty of driving under a suspended license, a felony, if the person was driving at a time during which his or her license had been revoked pursuant to two previous driving under the influence convictions. We held in *Hittle* that one can become a felon under § 60-6,196(6) only by having first committed multiple driving under the influence offenses, at least some of which are misdemeanors, and that the penalty for the act of driving under a suspended license had in a real sense been enhanced from one of misdemeanor status to one of felony status because under other circumstances, see Neb. Rev. Stat. § 60-4,186 (Reissue 1998), driving under a suspended license is a misdemeanor. Section 28-319(3) provides that in a first degree sexual assault case where the defendant has a prior conviction for first degree sexual assault, the crime shall be deemed first degree sexual assault, second offense. Both first degree sexual assault and first degree sexual assault, second offense, are felonies, and therefore, the subsequent offense of first degree sexual assault has not been enhanced as was the case in *Hittle*. Section 29-2221(1)(a) provides the specific enhancement mechanism where the current conviction is for a first degree sexual assault and the defendant has two or more prior felony convictions, including at least one of which is for first degree sexual assault. In such a case, § 29-2221(1)(a) dictates a sentencing range of 25 to 60 years' imprisonment.

The district court did not "doubly enhance" Burdette's sentence pursuant to both § 28-319(3) and the habitual criminal statute. Instead, the district court properly sentenced Burdette pursuant to § 29-2221(1)(a) as a habitual criminal. Pursuant to count I, Burdette was convicted of first degree sexual assault, second offense, in violation of § 28-319, and at least one of Burdette's prior felony convictions was for a violation of § 28-319. Section 29-2221(1)(a) controlled the sentencing of count I and provides that in such circumstances, the mandatory minimum term shall be 25 years' imprisonment and the maximum term not more than 60 years' imprisonment. The sentence imposed by the district court of 35 to 60 years' imprisonment on count I was within these statutory limits. Sentences within statutory limits will be disturbed by an appellate court only if the sentence complained of was an abuse of judicial discretion. *State v. Burkhardt*, 258 Neb. 1050, 607 N.W.2d 512 (2000). We find no abuse of discretion in the district court's sentencing of Burdette, and we therefore reject Burdette's final assignment of error.

## VI. CONCLUSION

We conclude that the district court did not err in admitting evidence of the 1982 sexual assaults committed by Burdette because the district court admitted the evidence for proper purposes, the probative value of such evidence was not outweighed by the risk of unfair prejudice, and the district court gave the jury proper limiting instructions. We further conclude that the district court did not err in admitting into evidence statements Burdette made to Pankonin on October 27, 1998, because such statements were not obtained in violation of Burdette's constitutional rights. Finally, we conclude that the district court did not abuse its discretion in sentencing Burdette. We therefore affirm Burdette's convictions and sentences.

AFFIRMED.