The STATE of Ohio, Appellee,

v.

RAMIREZ, Appellant.

[Cite as *State v. Ramirez* (1999), 135 Ohio App.3d 89.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 97–L–289.

Decided Dec. 27, 1999.

*Charles E. Coulson,* Lake County Prosecuting Attorney, *Vincent A. Culotta, Julie King Mitrovich* and *Wendy J. Smither,* Assistant Prosecuting Attorneys, for appellee.

*Niki Z. Schwartz, Orville E. Stifel, II* and *Richard L. Stoper, Jr.,* for appellant.

*S. Adele Shank* and *John Quigley,* urging reversal for *amicus curiae,* Government of United Mexican States.

WILLIAM M. O'NEILL, Judge.

Appellant, Alejandro Ramirez, appeals his conviction and sentence on one count of murder, in violation of R.C. 2903.02, with a firearm specification. For the reasons that follow, we reverse appellant's conviction and remand this case to the trial court.

The following facts are relevant to a determination of this appeal. On the evening of May 7, 1997, appellant was drinking tequila with some of his eleven housemates at their home at 122 Nebraska Street in Painesville, Ohio. Appellant was a twenty-year-old Mexican national who had lived his entire life in Mexico until January 24, 1997, when he moved to the United States. He could not speak, read, or understand a word of English. He was employed by a nursery working approximately fifty hours per week, and also by the LaMalfa restaurant working flexible hours. All of appellant's housemates were Mexican nationals, only one of whom spoke any English.

At some point in the evening, appellant passed out from drinking too much and was carried to his bedroom by his roommates. In the early morning hours of May 8, 1997, a male intruder entered the house, walked up the stairs, and stood

in the doorway of Alejandro Vargas' room where all of the residents of the house, except for appellant, were still drinking and listening to music. Vargas physically removed this unknown person, who appeared to be under the influence of drugs, from the house. Once the intruder was outside on the driveway, it is apparent that one of the residents of the house fired a gun at him, striking him in the chest. The intruder ran down the driveway and eventually collapsed on the tree lawn of a nearby house. The intruder, later identified as Arthur "Shelby" Gaston, eventually died at the hospital of the gunshot wound. A toxicology report confirmed that the decedent had cocaine in his system.

In response to an emergency call, a number of Painesville Police Officers began canvassing the area. Officer Jay Sharp knocked on the back door of appellant's residence. Alejandro Vargas answered the door and invited the officer inside. Appellant and two others were in the kitchen. Officer Sharp asked Vargas if he knew about the shooting and Vargas responded in the affirmative, indicating that appellant was responsible. Vargas then showed the officer where the gun had been placed in the pantry.

Appellant was transported to the Painesville Police Department where Detective Sergeant David Luhta interviewed him with the assistance of a translator, Jennifer Rodriguez. Rodriguez was employed as an administrative assistant for the Painesville Area Chamber of Commerce and had been used as an English/Spanish translator by the Painesville Police Department on five or six previous occasions. Her knowledge of the Spanish language was the result of having taken seven quarters of Spanish in college in the early 1980s and having lived in Mexico for a period of approximately six months at some unspecified time in her life. She had no familiarity with legal terms. The entire interview was recorded on audio tape.

Det. Sgt. Luhta instructed Rodriguez to read appellant his *Miranda* rights using the officer's Miranda card which was printed in English. Then appellant gave both an oral statement and a written statement admitting that he had fired the gun at Arthur Gaston. He was not aware at that time that Gaston had died. It is also apparent from the record that it was never explained to appellant that, as a foreign national, he had the right under Article 36 of the Vienna Convention to have his Mexican Consul present at the time of his interrogation and throughout the ensuing criminal proceedings.

Based upon the foregoing, appellant was indicted by the Lake County Grand Jury on May 19, 1997, on one count of murder, with a firearm specification. On May 20, 1997, appellant entered a "not guilty" plea to the charges.

On June 12, 1997, appellant filed a motion to suppress any oral or written statements he gave to the Painesville Police Department. Appellant's counsel asserted that appellant did not knowingly, voluntarily or intelligently waive his

*Miranda* rights and, thus, the statements were obtained in violation of his rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution. A hearing on appellant's motion to suppress was conducted on August 4, 1997. The trial court denied appellant's motion on September 2, 1997.

The matter proceeded to a jury trial, commencing on October 7, 1997, and concluding with a guilty verdict on October 15, 1997, after two days of deliberations. On October 28, 1997, appellant filed a motion for a new trial. The trial court subsequently denied that motion. On October 30, 1997, appellant was sentenced to serve an indefinite term of incarceration of fifteen years to life on the count of murder to be preceded by, and run consecutive to, an additional three years for the firearm specification.

Appellant timely filed a notice of appeal and has now set forth the following assignments of error:

"1. The trial court erred in denying Defendant's Motion to Suppress where (1) it is undisputed that the defendant could not speak, read, write or understand a single word of English, (2) the translator deployed to orally translate the requisite Miranda warnings into Spanish made numerous translation errors which rendered the warnings confusing and meaningless, (3) the Spanish translation never apprised defendant that he had a right to free counsel and that anything he said could be used against him, and (4) when the interrogating police officer asked if the defendant knew he had a right to remain silent and to counsel, the translator never addressed the defendant, but simply gave her own personal conclusion that the defendant knew and understood these rights.

"2. Defendant was denied his rights under Article 36 of the Vienna Convention on Consular Relations (1) to have the assistance of the Mexican Consul at the time of his interrogation and throughout the ensuing criminal proceedings and (2) to be informed of these rights by the arresting authorities 'without delay' when he was detained and taken into custody.

"3. The conviction should be reversed because Mr. Ramirez was denied the effective assistance of counsel.

"4. The lower court erred in denying defendant's motion for a continuance of three hours to present expert testimony on the issues of bullet trajectory and police procedures."

In the first assignment of error, appellant contends that the trial court erred in denying his motion to suppress because he did not knowingly, voluntarily or intelligently waive his *Miranda* rights before giving an oral and a written statement to the Painesville Police. Specifically, appellant maintains that the

state's attempt to give him the *Miranda* rights was unsuccessful due to a poor translation by Rodriguez. We agree.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court reversed the conviction of a Mexican defendant on the ground that he had not been adequately advised of his constitutional rights prior to giving a statement to the police. The court held that:

"the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

Additionally, the court held that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

In the present case, appellant presented the testimony of an expert witness, Veronica Dahlberg, a Mexican–American whose first language was Spanish. She provided a translation of the rights that Rodriguez gave to appellant in the early morning hours of May 8, 1997. According to Dahlberg, the following exchange occurred:

"Rodriguez: O.K. Alejandro? Here are your rights [underneath] the law. O.K.? Mr. Luhta [is a female police]

"Appellant: Mmm-hmm.

"Rodriguez: Ah, you have the right that something . . . that you . . . ah . . . can use against yourself in a court of law. You have [absolutely] on the [right hand side] to stay in silence, if you prefer. You have the right hand side to [non-word] to an attorney before . . .

"Appellant: Hmm?

"Rodriguez: and also you have the right hand side for the presence of an attorney here with you during the questions and also if you can't pay for an attorney, it is possible for having an attorney, O.K.? without paying before the questions, O.K.? Do you understand all of these your rights underneath the [law]?

"Appellant: Mmm-hmm.

"Rodriguez: O.K. Good. He says he does understand his rights as I have read them

"Luhta: O.K. Does . . . he knows that, ah, he doesn't have to . . . have to talk
. . .

"Rodriguez: That's correct.

"Luhta: He has the right to have an attorney?

"Rodriguez: Yes. Yes. That is correct.

"Luhta: Did you ask him? Does he want to make a statement without a lawyer?

"Rodriguez: Alejandro, do you want to talk a little tiny bit and [unintelligible] without an attorney? Or do you prefer ... do you have an attorney?

"Appellant: [unintelligible] without an attorney.

"Rodriguez: O.K. He will talk without the presence of a lawyer, Detective Luhta."

Clearly, there are significant problems with the rights given to appellant if Dahlberg's translation is to be believed. Instead of using the Spanish term for "legal rights," Rodriguez repeatedly used a term that means "right hand side." Thus, at no time was appellant apprised that he had any legal rights that he could have invoked. Instead, the use of an improper term rendered the warning confusing and meaningless.

Additionally, Rodriguez used the wrong preposition in attempting to translate the phrase "under the law." She used a word that means "underneath" in a physical sense rather than one that meant "on the basis of." Thus, a literal translation was that appellant had something to do with a right hand side that was physically underneath the law.

Also, Rodriguez never told appellant that he had the right to have an attorney present during questioning. At best, the word used by Rodriguez indicated that appellant was entitled to "notifications" of counsel although even that word was mispronounced.

In addition to the aforementioned translation/grammar problems, it is clear that certain aspects of the *Miranda* warnings were simply not given to appellant. First, it was not made clear to appellant that if he elected to speak, his statements could be used against him in a court of law. Second, it was not explained to appellant that he had the right to an attorney free of charge if he could not afford to hire one. The warnings given to appellant could perhaps be interpreted as meaning that he had the right to an attorney free of charge before questioning but that he would have to pay once questioning ended.

Finally, the attempt by Rodriguez to determine if appellant was willing to waive counsel sounded more like she was asking him if he had an attorney. Thus, his answer of "without an attorney" was meaningless without knowing appellant's interpretation of the convoluted question.

However, the state argues that Dahlberg's translation was overly technical. Instead, the state directs this court's attention to the translation performed by its own expert witness, Maria de la Camara. Dr. de la Camara, born in Madrid, Spain, is a professor of Spanish language and literature at Lake Erie College in Painesville, Ohio.

Dr. de la Camara translated the pertinent exchange between appellant and Rodriguez as follows:

"Rodriguez: OK. Alejandro, here are your rights under the law. OK? Mr. Luhta is a policeman. You have the right that something . . . can be used against you in a court of law. You have the absolute right to remain in silence. If you prefer, you have the right to the advice of a lawyer beforehand, and you also have the right to the presence of a lawyer here, with you, during the questioning. And, also, if you can't pay for a lawyer, it is possible to have a lawyer without paying before the questioning. OK? Do you understand all your rights under the law?

"Appellant: (Unintelligible)

"Rodriguez: OK. Well. He . . . understands his rights as I have read them.

"Luhta: He knows that he does not have to talk without having an attorney?

"Rodriguez: Yes.

"Luhta: Can you ask him, does he want to give a statement without a lawyer?·

"Rodriguez: Alejandro, do you want to speak a little bit (unintelligible) without a lawyer or do you prefer if you have a lawyer?

"Appellant: Without a lawyer.

"Rodriguez: OK. He will talk without the presence of a lawyer. (Unintelligible). Well . . ."

Dr. de la Camara's version of the foregoing exchange reflects a more complete version of the *Miranda* warnings than the version provided by Dahlberg, however, it is still insufficient. First, even under Dr. de la Camara's translation, appellant was not informed that anything he said could be used against him as evidence. Second, it was not made clear to appellant that he had the right to an attorney free of charge during all stages of questioning.

Additionally, Dr. de la Camara conceded that Rodriguez had made numerous translation errors. As a result, Dr. de la Camara substituted words that were not right with words that made more sense in the context of what was being explained to appellant. One of the problems with that tact was that Dr. de la Camara had lived in the United States for over thirty years, had obtained a Ph.D., and was bound to be quite familiar with the American justice system

having been used as a translator in criminal trials on many occasions. Appellant, on the other hand, was twenty years old, with no education, and had just moved to the United States a few months earlier. Dr. de la Camara concluded that if she could understand what Rodriguez meant, then appellant could understand also. This logic is without a basis when the differences between the two individuals and their diverse backgrounds are taken into account. See, *e.g.*, *United States v. Short* (C.A.6 1986), 790 F.2d 464, 469 (wherein the court acknowledged that special care is required in explaining rights to a defendant who "apparently had no knowledge of the American criminal justice system.")

Moreover, it is well-established that the manner in which both Rodriguez and Dr. de la Camara translated in the case *sub judice* has been repeatedly rejected. In *State v. Rodriguez* (1959), 110 Ohio App. 307, 13 O.O.2d 79, 169 N.E.2d 444, the court stated that an interpreter should not be permitted to give his own conclusions with respect to the answers of the witness but, instead, should give a literal translation of the witness' words. *Id.* at 316, 13 O.O.2d at 83–84, 169 N.E.2d at 450–451; see, also *State v. Pina* (1975), 49 Ohio App.2d 394, 398, 3 O.O.3d 457, 459–460, 361 N.E.2d 262, 265.

In the present case, when Det. Sgt. Luhta asked whether appellant knew that he did not have to talk without having an attorney, instead of asking appellant that question, Rodriguez answered for the appellant by responding affirmatively. Clearly, it is of no relevance to the court whether or not it is the belief of Rodriguez that appellant understands his rights. The pertinent question is whether *appellant* understands his rights.

Subsequently, when Dr. de la Camara translated the exchange, instead of simply translating the questions and answers word for word, she admittedly changed some of the language so that it made more sense in the context in which it was being used. Such is not the proper function of a translator and it explains why Dr. de la Camara's interpretation of the *Miranda* warnings given to appellant more closely resemble proper warnings than did those translated by Dahlberg.

■ While this court recognizes that there is no rigid rule requiring that the warnings given to an accused prior to interrogation be a virtual incantation of the precise language contained in the *Miranda* opinion, *State v. Dailey* (1990), 53 Ohio St.3d 88, 90, 559 N.E.2d 459, 461–462, citing *California v. Prysock* (1981), 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696, they must be sufficient to apprise the accused of those rights set forth by the United States Supreme Court in *Miranda*. *Duckworth v. Eagan* (1989), 492 U.S. 195, 202, 109 S.Ct. 2875, 2879–2880, 106 L.Ed.2d 166, 176–177.

There is no doubt that the warnings given to appellant by Rodriguez were insufficient to adequately apprise appellant of his rights. Based upon the

foregoing analysis, the trial court erred in denying appellant's motion to suppress since he was clearly not apprised of his *Miranda* rights. Thus, appellant's first assignment of error is sustained.

In the second assignment of error, appellant contends that he was denied his rights under Article 36 of the Vienna Convention on Consular Relations. Paragraph 1 of that provision states:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending state:

"(a) consular officers shall be free to communicate with nationals of the sending state and to have access to them. Nationals of the sending state shall have the same freedom with respect to communication with and access to consular officers of the sending state;

"(b) if he so requests, the competent authorities of the receiving state shall, without delay, inform the consular post of the sending state if, within its consular district, a national of that state is arrested or committed to prison or to custody . pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this subparagraph;* [Emphasis added.]

"(c) consular officials shall have the right to visit a national of the sending state who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending state who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action."

It is appellant's contention that "Article 36(1) of the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, guarantees an alien arrested on a criminal charge a right to be informed of the right to contact the consul of his home nation." It is undisputed that appellant was never informed of his right to contact the Mexican consulate.

However, based upon our decision regarding appellant's first assignment of error, all remaining assignments of error are moot and need not be addressed pursuant to App.R. 12(A)(1)(c). Any opinions offered with respect to any other issues raised would be merely advisory. We note that if the Vienna Convention had been complied with in this case, the errors detailed in appellant's first assignment of error would have been avoided. First, a competent translator would have been present to ensure that appellant's rights were not violated.

Second, the American legal system would have been explained to appellant who, as a Mexican national, had not been exposed to nuances of our justice system the way that most Americans are through the intense media saturation that exists in this country. Finally, the Mexican consul could have assisted in tracking down potential witnesses who had returned to Mexico between the time of the incident and the time of trial. As the Supreme Court of Ohio stated long ago, it is "the imperative duty of the judicial tribunals of Ohio to take cognizance of the rights of persons arising under a treaty to the same extent as if they arose under a statute of the state itself." *State v. Vanderpool* (1883), 39 Ohio St. 273, 276–277, 1883 WL 178.

Accordingly, for the reasons stated herein, the trial court erred in overruling appellant's motion to suppress the statements he gave to the police. Thus, appellant's first assignment of error is sustained. Appellant's second through fourth assignments of error are moot.

The judgment of the trial court is reversed, and the matter remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

FORD, P.J., and NADER, J., concur.