STATE OF NEBRASKA, APPELLEE, V. LUIS FERNANDO-GRANADOS, ALSO KNOWN AS LUIS VARGAS, APPELLANT.

682 N.W.2d 266

Filed July 2, 2004.   No. S-03-471.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

After a bench trial, Luis Fernando-Granados, also known as Luis Vargas, was convicted of one count of first degree murder and one count of use of a deadly weapon to commit a felony. He was sentenced to life in prison on the first degree murder conviction and to 10 to 20 years' incarceration on the weapon conviction, the sentences to be served consecutively. He perfected this appeal in which he contends that the district court erred in denying his motion to suppress statements he made to police because he was inadequately advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to making the statements. He also contends that the district court erred in receiving certain DNA evidence at his trial.

## I. BACKGROUND

On Sunday, May 26, 2002, the body of Mindy Schrieber was found in the parking lot of a restaurant in Douglas County where she was employed as a manager. Schrieber had been responsible for closing the restaurant on the evening of May 25. Investigators at the crime scene observed a tire tread pattern on the curb near the location where Schrieber's body was found and on the body itself. Other markings on the body were found to be consistent with markings on the oil pan of a Ford Escort automobile. The cause of death was determined to be multiple stab wounds and blunt trauma consistent with being struck by a motor vehicle.

Fernando-Granados and his girl friend were living together in May 2002. Fernando-Granados had been employed as a cook at the same restaurant where Schrieber had worked. Fernando-Granados' girl friend testified that on May 25, Fernando-Granados left their residence with Victor Hernandez in a Ford Escort owned by Hernandez. Fernando-Granados returned at approximately 3 o'clock the next morning, and on the following day, Fernando-Granados and his girl friend made a downpayment of $600 on a used car. Fernando-Granados made the payment in $100 bills. His girl friend learned of the homicide from news reports and on June 5, called Crimestoppers to leave an

anonymous tip that Hernandez may have been involved. On June 6, Fernando-Granados' girl friend found Schrieber's checkbook and driver's license hidden in a box of crackers in a kitchen cupboard of the residence she shared with Fernando-Granados.

On June 5, 2002, Omaha police notified the Douglas County Sheriff's Department that they were holding Fernando-Granados on an unrelated charge. Deputy Robert Jones and Det. John Pankonin interviewed Fernando-Granados at Omaha police headquarters on that day. Prior to this interview, Fernando-Granados was advised of his *Miranda* rights, in Spanish, from a form utilized by the sheriff's office. He indicated in Spanish that he understood the warnings and agreed to speak to the officers. During an interview that lasted approximately 1 hour, Fernando-Granados denied any involvement in the death of Schrieber.

On June 6, 2002, Hernandez implicated Fernando-Granados in the homicide. Deputies reinterviewed Fernando-Granados later that same day. Prior to this second interview, he was again advised of his rights in Spanish using the same advisory form and again indicated that he understood and agreed to give a statement. During this second interview, Fernando-Granados admitted that he killed Schrieber in the course of robbing the restaurant where they had worked. Prior to trial, Fernando-Granados filed a motion to suppress the statements which he gave to law enforcement officers. The district court denied the motion.

Fernando-Granados also filed a pretrial motion in limine to exclude evidence of DNA testing and the results of such testing. A hearing was conducted on whether the evidence was admissible under the standards articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). At the conclusion of the hearing, the court overruled the motion in limine.

Fernando-Granados waived his right to a jury trial, and a bench trial was conducted on March 20 and 21, 2003. At trial, the State offered the statements Fernando-Granados made to law enforcement officers and DNA evidence relating to blood found on a $1 bill taken during the robbery and on a portion of the wheel well of the Ford Escort owned by Hernandez. Fernando-Granados renewed the objections asserted in his pretrial motions, and the court overruled the objections and received the evidence.

Additional facts will be included in our analysis of the issues presented for appellate review.

## II. ASSIGNMENTS OF ERROR

Fernando-Granados assigns, restated, that the trial court committed reversible error (1) by denying his motion to suppress his statements because the rights advisory form written in Spanish did not conform to the requirements established by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and (2) by admitting evidence and testimony concerning DNA testing, analysis, and results because the State failed to meet the foundational requirements of *Daubert, supra.*

## III. ANALYSIS

### 1. DENIAL OF MOTION TO SUPPRESS

#### (a) *Miranda v. Arizona*

The Fifth Amendment to the Constitution of the United States provides in part that no person "shall be compelled in any criminal case to be a witness against himself." This constitutional privilege against compulsory self-incrimination "is also protected by the Fourteenth Amendment against abridgment by the States." *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

In *Miranda*, the U.S. Supreme Court specifically addressed the application of the Fifth Amendment to interrogation of persons held in the custody of law enforcement agencies. The Court held in *Miranda* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Specifically, the Court in *Miranda* held that

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise

of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478-79. The Court further held that such warnings and waiver "are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement" made by a defendant in police custody. 384 U.S. at 476. *Miranda* announced a "constitutional rule" which "requires procedures that will warn a suspect in custody of his right to remain silent and which will assure the suspect that the exercise of that right will be honored." *Dickerson v. United States*, 530 U.S. 428, 442, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

### (b) Suppression Hearing

In this case, Fernando-Granados filed a pretrial motion seeking to suppress "any and all statements obtained from him by members of the Douglas County Sheriff's Department or members of the FBI on or about June 7, 2002." The bases for his motion included that the statements were obtained "without properly advising him of his right to counsel, and his right against compulsory self-incrimination" and that he "did not make a knowing, voluntary and intelligent waiver of his right to counsel, and his right against compulsory self-incrimination." Where, as in this case, suppression of a statement is sought based upon a claimed violation of *Miranda*, the State bears the burden of proving waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed.

2d 473 (1986); *Lego v. Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

The State called Jones, Pankonin, and Gilberto Balli as witnesses at the suppression hearing. Jones was a deputy for the Douglas County sheriff's office, and Pankonin worked as a detective for that office. On June 5, 2002, they interviewed Fernando-Granados and three other individuals at the Omaha central police station in connection with the investigation of the death of Schrieber. The interviews were conducted by Pankonin. Jones, who is fluent in Spanish, assisted with translation where necessary.

At the beginning of the June 5, 2002, interview, Jones and Pankonin ascertained that Fernando-Granados spoke both English and Spanish. It was agreed that the interview would be conducted in English and that Jones would translate it into Spanish if necessary. Before the interview began, Jones advised Fernando-Granados of his rights utilizing a "Rights Advisory Form (Spanish)" bearing the letterhead of the Douglas County Sheriff's Department. The form consisted of six questions printed in Spanish:

> Q. Le hago intender que yo soy oficial de la policia. ¿Usted entiende eso?
>
> Q. Usted tiene el derecho de quedarse callado y no hacer ningún comentario ni contestar ninguna de mis preguntas. ¿Usted entiende eso?
>
> Q. Cualquier cosa que usted diga se puede usar, y se usará en contra de usted en la corte. ¿Usted entiende eso?
>
> Q. Usted tiene el derecho de consultar con un abogado y tener presente al abogado con usted durante las preguntas. ¿Usted entiende eso?
>
> Q. Si usted no tiene el dinero para emplear a un abogado, la corte puede nombrar uno par que lo representa. ¿Usted entiende eso?
>
> Q. Entendiendo sus derechos en esta situación, ¿esta usted despuesto a hacer una declaración conmigo ahora?

The form contained a blank space beneath each question in which the answer was to be written. After Jones read each question aloud in Spanish, Fernando-Granados indicated that he understood and Jones wrote "si" in the corresponding space on

the form. Fernando-Granados then initialed each "si" response and signed the form.

The actual interview was conducted in English, although Fernando-Granados requested that a few questions be rephrased in Spanish. During this interview, which lasted approximately 1 hour, Fernando-Granados did not request a lawyer or express an unwillingness to talk to the officers. He denied any involvement in the robbery of the restaurant or the Schrieber homicide.

After obtaining additional information which implicated Fernando-Granados in the crimes, officers interviewed him a second time on June 6, 2002. On this occasion, Pankonin was accompanied by Balli, a special agent with the Federal Bureau of Investigation (FBI) assigned to its Omaha office. Balli is fluent in Spanish and certified by the FBI as a Spanish speaker. Balli conducted the interview after first advising Fernando-Granados of his rights, in Spanish, utilizing another copy of the same form which had been used in the first interview. Balli testified that he read the rights to Fernando-Granados from the form. Fernando-Granados gave affirmative responses to each question and signed the form. Balli ascertained from Fernando-Granados that he would be more comfortable speaking in Spanish, so he conducted the interview in that language, although at times during the interview, Fernando-Granados made comments in English. After initially denying involvement, Fernando-Granados admitted committing the robbery and homicide. All three officers involved in the two interviews denied making any threats, promises, or inducements to Fernando-Granados, and testified that he appeared willing to speak to them and did not request a lawyer.

During the suppression hearing, both Jones and Balli translated the substantive content of the rights advisory form from Spanish to English. The two substantially agreed that the translation of the first through fourth and sixth questions, with the English translation noted in brackets, was as follows:

Le hago intender que yo soy oficial de la policia. ¿Usted entiende eso? ["I will have you understand that I am an officer or agent of the police. Do you understand that?"]

. . . Usted tiene el derecho de quedarse callado y no hacer ningún comentario ni contestar ninguna de mis preguntas. ¿Usted entiende eso? ["You have the right to remain silent

and not make any statements nor answer my questions. Do you understand that?"]

. . . Cualquier cosa que usted diga se puede usar, y se usará en contra de usted en la corte. ¿Usted entiende eso? ["Anything you make can be used against you and will be used against you in court. Do you understand that?"]

. . . Usted tiene el derecho de consultar con un abogado y tener presente al abogado con usted durante las preguntas. ¿Usted entiende eso? ["[Y]ou have the right to consult with a lawyer and have a lawyer present with you during questioning. Do you understand this?"]

. . . .

. . . Entendiendo sus derechos en esta situación, ¿esta usted despuesto a hacer una declaración conmigo ahora? ["Understanding your rights in this situation are you willing to make a statement with me now?"]

During direct examination, Jones and Balli were questioned concerning the fifth rights advisement on the form, which provided, "Si usted no tiene el dinero para emplear a un abogado, la corte puede nombrar uno par que lo representa. ¿Usted entiende eso?" Both testified that this advisement provided that if the suspect did not have money to hire an attorney, the court "will appoint" one. On cross-examination, however, both conceded that by utilizing the Spanish word "puede," the advisement did not say "will," but, rather, that the correct translation was "the court may" or the court "has the ability to" appoint a lawyer.

Fermin Garcia testified on behalf of Fernando-Granados at the hearing on the motion to suppress. Garcia is a professor of Spanish language and literature at the University of Nebraska at Omaha. Garcia translated the fifth advisement to provide:

"If you don't have money to employ a lawyer, the court," and this is the difficult thing, puede, p-u-e-d-e, could be translated into could, could be — be able to name or would name, and also "may" is implied with that puede. So the court could or be able to or may name one, one lawyer to represent, to represent the person.

He stated that in his opinion, the language was ambiguous because "it implies that it might not happen. It's not said clearly that he or she will get one — somebody to represent the person.

It implies that it could happen. So it leaves the person in doubt that may not have one to represent that person." Garcia further testified that the Spanish language rights advisement form utilized by the FBI uses language which, translated into English, states: "If you, the person, cannot pay the expenses of a lawyer, one will be assigned before initiating the interrogation. And if you desire that way, if you so desire."

In its order denying the motion to suppress, the district court found that Fernando-Granados

> was told in his native language that he had a right to remain silent, that anything he said could be used against him in court, that he had a right to speak to an attorney and have an attorney present during questioning. He was further advised that if he did not have the money to pay for a lawyer the Court [could, may, can] had the ability to appoint one for him.

The district court further found that "[a]t no time during the interviews did [Fernando-Granados] indicate he did not understand or comprehend what was going on. He never indicated he wanted an attorney or could not understand what was being said about the lawyer." Based upon these findings of fact, the district court concluded that Fernando-Granados made "a knowing, voluntary, and intelligent waiver of his rights" and overruled his motion to suppress.

### (c) Standard of Review

Although the motion to suppress was based upon alternative grounds, in this appeal, Fernando-Granados contends that the district court erred in denying it for a single reason; namely, that the advisements given to him in Spanish did not conform to the requirements of *Miranda* because they did not inform him that an indigent suspect "will be" provided an attorney at no cost if he cannot afford counsel. He makes no claim on appeal that the statements should have been suppressed as the product of threats, promises, or inducements. Compare *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004) (applying clearly erroneous standard of review to district court's determination that defendant's statement was voluntarily made and not product of promise of leniency).

We have not previously articulated the standard by which we review the denial of a motion to suppress a defendant's custodial statement based solely upon a claim that the *Miranda* warnings given were incomplete or otherwise inadequate to effectuate a knowing waiver of the defendant's Fifth Amendment privilege. Appellate review of such a claim involves two distinct inquiries. First, what warnings were actually given before the statement was obtained? Second, were such warnings legally sufficient under *Miranda* to form the basis of a knowing waiver of the privilege against compulsory self-incrimination? The first inquiry involves review of the factual determinations made by the district court, while the second requires consideration of whether the district court correctly assessed the legal consequences which flow from its factual determinations.

In *Thompson v. Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), the U.S. Supreme Court held that whether a suspect is "in custody" and therefore entitled to *Miranda* warnings presents a mixed question of law and fact. Based upon this holding, we concluded in *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000), that appellate review of this Fifth Amendment issue should be governed by the two-stage standard set forth in *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), with respect to mixed questions of law and fact in a Fourth Amendment context. See, also, *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). We therefore held in *Burdette* that in reviewing a motion to suppress statements to determine whether an individual was "in custody" for purposes of *Miranda*, findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error, and the determination of whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave is reviewed de novo.

Other appellate courts have applied this two-stage standard in reviewing a trial court's determination regarding a waiver of *Miranda* rights. See, e.g., *People v. Platt*, 81 P.3d 1060 (Colo. 2004) (holding trial court's determination of whether there has been valid waiver of *Miranda* rights involves both factfinding and law application; former entitled to deference if supported by competent evidence, and latter reviewed de novo on appeal);

*State v. Jaco,* 130 Idaho 870, 873, 949 P.2d 1077, 1080 (Idaho App. 1997) (factual findings reviewed for substantial evidence, and " 'free review of the lower court's decision as to whether the constitutional requirements have been satisfied in light of the facts found,' " quoting *State v. Carey,* 122 Idaho 382, 834 P.2d 899 (Idaho App. 1992)); *State v. Lockhart,* 830 A.2d 433, 442 (Me. 2003) ("[a]lthough the suppression court's factual findings are reviewed for clear error, the issue of whether rights under *Miranda* have been knowingly and intelligently waived is reviewed de novo"); *State v. Dominguez-Ramirez,* 563 N.W.2d 245, 252 (Minn. 1997) ("[o]n appeal, this court will independently determine, on the basis of the facts as found by the district court, whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary"); *State v. Barrera,* 130 N.M. 227, 234, 22 P.3d 1177, 1184 (2001) ("we review the trial court's findings of fact for substantial evidence and review de novo the ultimate determination of whether a defendant validly waived his or her *Miranda* rights prior to police questioning"); *State v. Ramirez-Garcia,* 141 Ohio App. 3d 185, 187, 750 N.E.2d 634, 636 (2001) (factual findings supported by evidence are accepted, and based on those facts, "we then must determine 'without deference to the trial court, whether the court has applied the appropriate legal standard,' " quoting *State v. Anderson,* 100 Ohio App. 3d 688, 654 N.E.2d 1034 (1995)). Contra *Jackson v. Com.,* 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003) ("[w]hether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong").

█ We therefore hold that on appellate review of a trial court's ruling on a motion to suppress a custodial statement based upon a claimed inadequacy of *Miranda* warnings, findings of fact as to the warnings given are reviewed for clear error, and the determination of whether such warnings were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment privilege against compulsory self-incrimination is reviewed de novo.

### (d) Resolution

Advising persons in police custody of what "have come to be known colloquially as '*Miranda* rights' " prior to interrogation is

"embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States*, 530 U.S. 428, 435, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). "*Miranda* requires procedures that will warn a suspect in custody of his right to remain silent and which will assure the suspect that the exercise of that right will be honored." *Dickerson*, 530 U.S. at 442. "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). A " 'defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly, and intelligently.' " *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The waiver inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421. In this case, we focus on the second dimension of the waiver inquiry to determine if the advisements given were sufficient to establish a knowing and intelligent waiver of Fernando-Granados' Fifth Amendment privilege.

It is undisputed that Fernando-Granados was advised, in his native language, that he had a right to remain silent and that anything he said could be used against him in a court of law. He was thus made aware "not only of the privilege, but also of the consequences of forgoing it." See *Miranda*, 384 U.S. at 469. Likewise, it is undisputed that Fernando-Granados was advised, in Spanish, that he had a right to consult with a lawyer and to have a lawyer present during interrogation. The Court in *Miranda* held this right to be "indispensable to the protection of

the Fifth Amendment privilege" delineated in its opinion. See 384 U.S. at 469.

The issue presented for our review is whether Fernando-Granados was adequately warned of the remaining "*Miranda* right*,*" i.e., that "if he is indigent a lawyer will be appointed to represent him." See 384 U.S. at 473. The Court in *Miranda* reasoned:

> Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

*Id.*

With respect to this warning, the district court made a factual determination that Fernando-Granados was advised that "if he did not have the money to pay for a lawyer the Court [could, may, can] had the ability to appoint one for him." Fernando-Granados does not assign nor do we find clear error in this finding of historical fact, and we therefore accept it as true and proceed with our independent evaluation of whether this advisement, together with those that preceded it, was legally sufficient to effectuate an intelligent and knowing waiver of Fernando-Granados' Fifth Amendment privilege under *Miranda.*

Other courts have held that a defendant's statement must be suppressed under *Miranda* if there is a complete failure to advise of the right of an indigent person to appointment of counsel. See, e.g., *United States v. Fox*, 403 F.2d 97, 100 (2d Cir. 1968) (holding defendant's statement inadmissible where "[n]othing at all was said to [defendant] about his right to have an attorney appointed prior to questioning if he could not afford one, as *Miranda* requires"); *Thompson v. State*, 595 So. 2d 16, 17 (Fla. 1992) (holding "police must somehow communicate to the accused the basic idea of the right to consult a free attorney

before being questioned"); *State v. Ford*, 713 So. 2d 1214 (La. App. 1998) (finding error in failing to suppress statement where there was no evidence that defendant was advised of his right to court-appointed counsel if he was indigent). The instant case is distinguishable from the foregoing, however, in that prior to any questioning, Fernando-Granados was given an advisement on the subject of court-appointed counsel. His contention is that this advisement was legally inadequate because it "indicates a mere possibility, instead of an absolute right to have appointed counsel." Brief for appellant at 9.

The U.S. Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989). The " ' "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' and . . . 'no talismanic incantation [is] required to satisfy its strictures.' " *Duckworth*, 492 U.S. at 202-03, quoting *California v. Prysock*, 453 U.S. 355, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981). A court "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. *The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by* Miranda.' " (Emphasis supplied.) *Duckworth*, 492 U.S. at 203, quoting *Prysock, supra.*

Fernando-Granados relies principally upon three cases in support of his argument that this standard was not met. In *U.S. v. Higareda-Santa Cruz*, 826 F. Supp. 355 (D. Or. 1993), a defendant was purportedly advised of his *Miranda* rights through the use of a card on which the rights were printed in Spanish. After making a specific finding that the defendant was never in fact shown "the Spanish *Miranda* card," the court noted in dicta that even if the card had been shown, its statement of the defendant's rights was inadequate. *Higareda-Santa Cruz*, 826 F. Supp. at 359. As translated, the card stated: " 'In case that you do not have money, you have the right to petition an attorney from the court.' " *Id.* at 359-60. Without referring to the *Duckworth* standard, the court reasoned that this statement implied both that the defendant must be completely without money before an appointed attorney could be obtained and that the defendant might not even then obtain counsel because he had to somehow

"petition" the court for an attorney. *Higareda-Santa Cruz*, 826 F. Supp. at 360.

Fernando-Granados also relies upon *State v. Ramirez*, 135 Ohio App. 3d 89, 732 N.E.2d 1065 (1999), and *People v. Diaz*, 140 Cal. App. 3d 813, 189 Cal. Rptr. 784 (1983). In *Ramirez*, the court concluded that attempts to advise the defendant of his *Miranda* rights failed due to a poor Spanish translation which utilized a term that meant " 'right hand side' " instead of " 'legal right,' " and also did not inform the defendant that anything he said could be used against him and that "he had the right to an attorney free of charge during all stages of questioning." *Ramirez*, 135 Ohio App. 3d at 94-95, 732 N.E.2d at 1068-69. In *Diaz*, the court stated in dicta that a warning stating that " '[i]f you cannot *get* a lawyer, one can be named before they ask you questions' " did not comply with *Miranda* because the defendant "was never advised that he had the right to appointed counsel if he could not *afford* one." 140 Cal. App. 3d at 822, 824, 189 Cal. Rptr. at 789-90.

The State argues that the facts in *Duckworth v. Eagan*, 492 U.S. 195, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989), demonstrate the degree of grammatical latitude which may be taken with respect to the *Miranda* warnings. After being advised of his right to remain silent, the consequences of forgoing that right, and his right to counsel before and during any interrogation, the defendant was advised that he had the right to the advice and presence of a lawyer even if he could not afford to hire one. Then, police informed him, " '*We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.*' " *Duckworth*, 492 U.S. at 198. The Court of Appeals for the Seventh Circuit held that because this statement conveyed the impression that the suspect would be entitled to appointment of counsel only at some point after interrogation, the warning was constitutionally inadequate. Viewing the warnings in their totality, the U.S. Supreme Court held that they reasonably conveyed the suspect's rights as required by *Miranda*, noting that *"Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Duckworth*, 492 U.S. at 204.

In *U.S. v. Soria-Garcia*, 947 F.2d 900 (10th Cir. 1991), the court applied the *Duckworth* rationale to a *Miranda* warning which was given in Spanish. One of the arresting officers testified that the English translation was: " 'If you don't have the money to employ a lawyer one will be appointed to you before answering any questions, if you so decide.' " (Emphasis omitted.) *Soria-Garcia*, 947 F.2d at 901. An interpreter for the district court translated the sentence as follows: " 'If you do not have the money to employ an attorney, one can be obtained for you before we ask you any questions, if you so desire.' " *Id.* The district court determined this warning to be deficient because it did not include an advisement that a lawyer would be appointed " 'at no cost.' " *Id.* Focusing primarily on this issue, the court of appeals reversed, determining that under the *Duckworth* standard, the "thrust of the warning, regardless of which translation is used," " 'reasonably conveyed' " the suspect's rights as required by *Miranda*. *Soria-Garcia*, 947 F.2d at 902-03.

Fernando-Granados was advised in Spanish that " 'you have the right to consult with a lawyer and have a lawyer present with you during questioning.' " After answering " 'si,' " he was then advised that "if he did not have the money to pay for a lawyer the Court [could, may, can] had the ability to appoint one." The precise issue presented is whether the two warnings, read together, would create a misunderstanding that a court has discretion to deny an indigent person's request for appointment of counsel.

Under similar circumstances, other state and federal courts have resolved this question in the negative. For example, in *State v. Rhines*, 548 N.W.2d 415, 428 (S.D. 1996), the defendant was told " 'if you cannot afford an attorney an attorney can be appointed for you free of charge.' " The court concluded that given that the police had correctly informed the defendant of his other rights, the " 'can' be appointed" language would not have misled him into believing that a request for an attorney could have been denied. *Id.* Similarly, in *U.S. v. Miguel*, 952 F.2d 285, 287 (9th Cir. 1991), the defendant was told " '[y]ou may have an attorney appointed by the U.S. Magistrate or the court to represent you, if you cannot afford or otherwise obtain one.' " The court determined that read within the context of the other warnings, which were correctly given, the defendant would have been

"able to grasp the substance of what he was told—that he had the right to appointed counsel if he could not afford a lawyer." *Id.* at 288. Likewise, in *Commonwealth v. Colby*, 422 Mass. 414, 418, 663 N.E.2d 808, 811 (1996), the defendant was told that " 'if he could not afford an attorney, the Commonwealth would attempt to provide one for him.' " The court refused to suppress the defendant's incriminating statements, noting that "[t]he departure from the standard Miranda language here seems less harmful than the departure tolerated in the *Duckworth* case." 422 Mass. at 418, 663 N.E.2d at 811.

Considering in their totality the advisements given in this case, Fernando-Granados was clearly advised of his right to remain silent, the consequences of forgoing that right, and his right to have an attorney present during questioning. The challenged warning, while not a verbatim Spanish translation of the language used in *Miranda*, was sufficient to accomplish what the U.S. Supreme Court stated as its purpose, namely, to prevent a misunderstanding that the right to consult a lawyer is conditioned upon having the funds to obtain one. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Fernando-Granados was effectively advised that if he wanted a lawyer and could not afford one, he could request appointed counsel and that the court had the authority to grant his request. Although the phrase "will appoint" was not used, the advisement was nevertheless sufficient to reasonably inform him of his right to an attorney, and to apprise him that a method, i.e., appointment by the court, existed for ensuring that an attorney was available to him. Considered in their entirety, the warnings given to Fernando-Granados do not imply that the court had discretion to deny a request for appointment of counsel. After the prosecution had demonstrated "the use of procedural safeguards effective to secure the privilege against self-incrimination," see *Miranda*, 384 U.S. at 444, as a matter of law, the district court did not err in denying the motion to suppress the statements given by Fernando-Granados while in custody.

## 2. ADMISSION OF DNA EVIDENCE

### (a) Additional Background

In the statement given on June 6, 2002, Fernando-Granados told authorities that he stabbed Schrieber in the course of robbing

the restaurant. After the killing, Fernando-Granados ran over Schrieber's body in the parking lot with Hernandez' Ford Escort. Fernando-Granados stated that he and Hernandez, who had been waiting for him in the restaurant parking lot, then went to a friend's home.

Pursuant to a search warrant, police searched the residence identified by Fernando-Granados and recovered cash wrapped in a towel. A substance having the appearance of blood was found on one of the bills. DNA testing was later performed to determine the source of the blood found on the bill and additional blood found on the body of the Ford Escort owned by Hernandez. The tests disclosed that the blood contained genetic markers consistent with the known genetic markers of Schrieber and a high probability that she was the source of the blood.

Fernando-Granados filed a pretrial motion in limine to exclude the DNA evidence, contending that it was inadmissible under Neb. Rev. Stat. § 27-702 (Reissue 1995) and the interpretative principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), which principles were adopted by this court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). Following an evidentiary hearing, the district court made specific findings that the scientific evidence was admissible under *Daubert/Schafersman* and overruled the motion. Fernando-Granados preserved his objection at trial. On appeal, Fernando-Granados argues the State failed to establish the evidentiary reliability and relevance of the DNA evidence under the *Daubert/Schafersman* standard, and thus the district court erred in admitting the DNA evidence.

### (b) Standard of Review

The *Daubert* standards require proof of the scientific validity of principles and methodology utilized by an expert in arriving at an opinion in order to establish the evidentiary relevance and reliability of that opinion. *Perry Lumber Co. v. Durable Servs.*, 266 Neb. 517, 667 N.W.2d 194 (2003); *Schafersman, supra*. A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004); *Perry Lumber Co., supra*. A

judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system. *Carlson, supra.*

## (c) Resolution

Under the *Daubert/Schafersman* framework, the trial court must act as a gatekeeper to ensure the evidentiary relevance and reliability of the expert's opinion. *Carlson, supra*; *Schafersman, supra*. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* In determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that might bear on a judge's gatekeeping determination. *Id.* These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id.* Under *Daubert* and *Schafersman*, expert evidence is admissible "so long as foundation is presented to satisfy the court of the validity of the theory or methodology underlying the proffered opinion." *Schafersman*, 262 Neb. at 233, 631 N.W.2d at 877.

The DNA evidence in this case was presented through the expert testimony of Dr. James Wisecarver and a medical technologist, Kelly Duffy. Both were associated with the molecular diagnostics laboratory at the University of Nebraska Medical Center. They employed a DNA testing methodology known as polymerase chain reaction short tandem repeat (PCR-STR). In *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998), we held

that the trial court did not err in finding that the PCR-STR DNA test was generally accepted within the scientific community under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which then governed the admissibility of scientific evidence in this state.

Wisecarver is a pathologist who also holds a doctorate in physiology. He serves as the medical director of the molecular diagnostics laboratory at the University of Nebraska Medical Center, which has conducted forensic DNA testing since 1996. Wisecarver testified that the laboratory did not conduct such testing prior to that date because of concerns about the certainty of interpretation in the restriction fragment length polymorphism (RFLP) methodology which preceded PCR-STR. He testified that after the PCR-STR methodology was developed and validated in the early 1990's, his laboratory began using it, initially in connection with bone marrow transplants and then for forensic purposes.

Wisecarver testified that PCR-STR is generally accepted in the scientific community and is used widely by forensic laboratories across the country, including those of the FBI and the Armed Forces Institute of Pathology. Wisecarver's laboratory has developed protocols for performing the PCR-STR analysis which have been reviewed by the American Society of Crime Laboratory Directors (ASCLD), a credentialing body which reviews and accredits forensic DNA laboratories. Among the ASCLD quality assurance standards for forensic DNA testing laboratories is a requirement that the laboratory have a program of proficiency testing which "measures the capability of its examiners and the reliability of its analytical results." The molecular diagnostics laboratory participates in a proficiency testing program and was accredited by the ASCLD at the time of Wisecarver's testimony in this case.

The PCR-STR analysis of blood on blood involves several steps. First, presumptive testing is done to confirm the presence of hemoglobin in specimens thought to contain traces of blood. If the presence of blood is thus confirmed, nucleic acids containing DNA are extracted from the specimen and exposed to a reacting agent. Instruments are then utilized to amplify DNA fragments, separate them by size, and label them with a fluorescent

marker. This process results in 15 short tandem repeat genetic markers designating the location on the gene and another marker, known as amelogenin, which designates gender. This raw data is then subjected to a computer program, known as Genotyper, which assigns an allelic designation to each marker. The results are then compared to a reference sample from a known individual. If the genetic profile obtained from the sample being tested does not match the reference sample, the submitter of the sample is excluded as a contributor of the test specimen. However, if a match is produced, a statistical analysis is performed utilizing a population database to determine the frequency of occurrence of the fragment sizes identified in the test. The database used in this case was published in the Journal of Forensic Sciences in 2001. A technique known as the "product rule" is then utilized to determine the probability of an unrelated individual matching the DNA profile obtained from the test specimen. Wisecarver testified that the published source of the database is a peer-reviewed scientific journal and that the "product rule" is peer-reviewed and accepted in the scientific community.

The district court took judicial notice of the Nebraska DNA Testing Act, Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Cum. Supp. 2002), which became effective on September 1, 2001, and provides a procedure whereby a convicted person in custody may seek previously unavailable DNA testing which may be used to secure release or a new trial. See, §§ 29-4120 and 29-4123; *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004). The act includes a legislative finding that "[b]ecause of its scientific precision and reliability, DNA testing can, in some cases, conclusively establish the guilt or innocence of a criminal defendant" and in other instances "may have significant probative value to a finder of fact." § 29-4118(2). The Legislature further found that

> new forensic DNA testing procedures, such as polymerase chain reaction amplification, DNA short tandem repeat analysis, and mitochondrial DNA analysis, make it possible to obtain results from minute samples that previously could not be tested and to obtain more informative and accurate results than earlier forms of forensic DNA testing could produce.

§ 29-4118(3). The act further provides that any DNA testing done pursuant to its provisions must be performed in a laboratory accredited by one of several national accrediting bodies, including the ASCLD, or a public agency with equivalent requirements. § 29-4120(6).

Based upon this record, we conclude that the district court did not abuse its discretion in finding that the PCR-STR DNA testing methodology employed in this case "is a reliable technique, validated and generally accepted within the scientific community and has been subjected to peer review." However, as recently stated in *Carlson v. Okerstrom*, 267 Neb. 397, 413, 675 N.W.2d 89, 105 (2004), "it is not enough for the trial court to determine that an expert's methodology is valid in the abstract. The trial court must also determine if the witness has applied the methodology in a reliable manner."

Here, the trial court made an additional finding that "Medical Technician Kelly Duffy followed the protocol in place to ensure that the tests were performed properly and with a known rate of error." The record supports this finding. Duffy holds a bachelor of science degree with majors in microbiology and medical technology and a minor in chemistry. She completed a 1-year internship in medical technology, and she holds certifications as a medical technologist, a clinical histocompatibility technologist, and a clinical histocompatibility specialist. At the time of her testimony, she had been employed at the molecular diagnostics laboratory since 1988. She performed the DNA testing in this case utilizing the approved protocols for PCR-STR DNA testing, with minor deviations approved by Wisecarver which had no impact on the process. She examined 12 submitted items of evidence and a known reference specimen from Schrieber. Presumptive testing for hemoglobin eliminated 5 of 12 evidence specimens submitted and confirmed the presence of hemoglobin (presumptive for blood) on the other 7 specimens. Of these seven specimens, five were subjected to further testing. After determining that DNA from these five specimens, including the $1 bill and wheel-well cover, matched the reference specimen from Schrieber, Duffy did a frequency analysis which determined that Schrieber was not excluded as a major contributor of the blood on the specimens and that the probability of an unrelated individual matching the major

DNA profile was 1 in 280 quadrillion for Caucasians, 1 in 37 quintillion for African Americans, and 1 in 16.2 quintillion for American Hispanics. Duffy prepared a report documenting the tests performed pursuant to protocol and the results obtained. The report was reviewed and signed by Wisecarver, by the laboratory director, and by Duffy.

Because the record reflects that the DNA testing in this case was properly performed in accordance with a scientifically reliable methodology, we conclude that the district court did not abuse its discretion in finding that the results offered by the State were reliable and relevant and that their probative value outweighed the risk of unfair prejudice. Our research indicates that every jurisdiction that has addressed the admissibility of PCR-STR DNA analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), has found the evidence admissible. *U.S. v. Ewell*, 252 F. Supp. 2d 104 (D.N.J. 2003); *U.S. v. Trala*, 162 F. Supp. 2d 336 (D. Del. 2001); *People v. Shreck*, 22 P.3d 68 (Colo. 2001); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (1997); *State v. Butterfield*, 27 P.3d 1133 (Utah 2001).

## IV. CONCLUSION

Finding no error in the admission of the statements given by Fernando-Granados while in custody or the results of DNA testing conducted by the State, we affirm the convictions and sentences imposed by the district court.

AFFIRMED.